**UNITED STATES of America**

**v.**

**Mikel Travis MICHEL.**

**UNITED STATES of America**

**v.**

**Donald Eugene KING.**

**Crim. Nos. 17414, 17416.**

United States District Court
S. D. Texas,
Laredo Division.

Nov. 5, 1957.

Charles L. Short, Laredo, Tex., for the United States.

John E. Fitzgibbons, Laredo, Tex., for Mikel Travis Michel.

Jacob G. Hornberger, Laredo, Tex., for Donald Eugene King.

CONNALLY, District Judge.

The defendants, Michel and King, were charged in two counts in the above styled proceedings with the importation and concealment of a quantity of heroin. Prior to trial each moved to suppress as evidence the quantity of narcotics involved in his case, contending that his constitutional rights under the Fourth and Fifth Amendments had

been violated in the manner in which the evidence was procured.

These two young men are American citizens and residents of Houston, Texas. They had proceeded together to Laredo, Texas, and thence to Nuevo Laredo, Mexico, to purchase, and to smuggle into this country, a small quantity of narcotics, as they had done successfully on a prior occasion. While across the border each had placed a quantity of heroin in a rubber sheath, secured the open end thereof, and had then swallowed the container. On their return and while in custody of the customs officers each was required to take a strong emetic, as a result of which the sheath containing the heroin was recovered from each of them. It is contended that under the circumstances hereinafter set out the person of each defendant was subjected to an unreasonable search, and that the seizure of the contraband was unreasonable, in contravention of the Fourth Amendment. Additionally, it is contended that the conduct of the customs officers was of such nature as to constitute a deprivation as to each defendant of due process of law in contravention of the Fifth Amendment. The details of the disgusting affair are as follows:

Both defendants were users of the drug. They proceeded from Laredo to Nuevo Laredo, Mexico, and after a brief stay to purchase the heroin, returned across the International Bridge about midnight of March 23–24. The customs officers on duty at the bridge had advance information concerning these defendants and the purpose of their trip, and were alerted for their return. When the defendants presented themselves at the customs inspection station they were taken to an examining room and were requested to disrobe, and a search was made of their clothing. When this revealed nothing, the customs officers contacted Dr. John T. Lowry, a physician and surgeon engaged in the general practice of medicine in the city of Laredo and who likewise served as federal jail physician and transported the defendants to his office. Dr. Lowry made an ex-amination of each. He found what he took to be needle marks on the arm of each defendant, and dilation of the pupils and other symptoms indicating that both were then under the influence of narcotics. Both defendants admitted the infrequent use of heroin, though they denied their addiction, or any obligation to register under § 1407 of Title 18 U.S.C.A. Dr. Lowry made a manual examination of the exterior of their bodies and of the anal cavity. This examination likewise disclosed nothing. Thereupon a fluoroscopic examination was made by means of X-ray. This revealed a foreign object in the abdomen of the defendant King, which Dr. Lowry considered to be a cellophane container.

The defendants were transported by the officers to the "customs shed," a large building near the outskirts of the city. Dr. Lowry and the customs officers interrogated them further, and the doctor explained that fatal consequence might result from an overdose of heroin. He explained the dangers of a package becoming ruptured within one's stomach or alimentary canal. The defendant Michel admitted that he had swallowed a rubber container of heroin.

The doctor administered to each defendant a substantial quantity of castor oil. This dosage soon necessitated frequent visits by each defendant to the restroom, always under the watchful eye of a customs officer, but the rubber container was not produced in either case. After some two hours were spent in this fashion, Dr. Lowry prescribed a dose of epsom salts. Shortly after swallowing his epsom salts, the defendant Michel became nauseated and about 3:00 a. m. expelled from his body by vomiting the rubber packet which he had swallowed, found to contain about two grams of heroin. To this point both defendants had been cooperative and had submitted without protest. They had been at large within the building above mentioned, in company with several customs officers and Dr. Lowry. At about 4:00 a. m. the defendant King refused to swallow the dosage of epsom salts prepared for him.

Considerable conversation and argument was unavailing, and he was adamant.

Sometime thereafter the customs agents, other than David C. Ellis, were called in line of duty to other assignments, and Ellis was left alone with the two defendants. Under these circumstances, and with each defendant repairing frequently to the restroom, Ellis was unable adequately to guard both men. He handcuffed King to a stationary object within the room for a period estimated at from twenty minutes to one hour. Later in the morning, King agreed to and did accept and swallow the epsom salts. Several hours later the packet of heroin which he had swallowed passed completely through his alimentary canal and was recovered. At about 4:00 or 5:00 p. m. March 24 both defendants were lodged in jail.

King's testimony would lead one to believe that he was handcuffed by agent Ellis for punitive reasons, and in an effort to coerce him into accepting the second dosage. I find to the contrary. The defendant himself does not contend that he was subjected to any pain, that he was required to remain in an awkward position, or was otherwise mistreated. It is only that he was handcuffed. Under the circumstances I find this an entirely reasonable effort on the part of the agent to secure and restrain this defendant.

The reported cases are few in number wherein law enforcement officers have forcibly removed from one in custody the contents of his stomach or his alimentary canal.[1] The most recent and closely analogous is the opinion of the Court of Appeals of the Ninth Circuit in Blackford v. United States, 247 F.2d

745.[2] There a divided court held that a rubber encased packet of narcotics constituted legitimate and admissible evidence, when same was removed by a physician at the instance and request of customs officers from the rectum of a smuggler over his violent protest and objection. There, as here, the arresting officers had every reason to believe (including the admission of the defendant himself) that the effort was being made to smuggle narcotics into the country, and they knew where the packet was secreted; and the efforts to remove it were accomplished in a humane, sanitary and medically approved fashion by a competent physician, though with the exercise of considerable force. That case differs from this only in that here the packet was taken orally, and here no force whatsoever was applied to the person of either defendant. Blackford holds, as do countless other authorities,[3] that the Fourth Amendment only proscribes unreasonable searches and seizures. Additionally, it holds that the "reasonable" restriction which the amendment imposes is of dual significance. First, the search is a reasonable one only if the circumstances warrant a search initially. Thus a search pursuant to a proper warrant, or, without a warrant where the circumstances permit,[4] is reasonable, and permissible, in this sense. Secondly, to be harmonious with the mandate of the Fourth Amendment, the search must be "reasonable" in scope and extent. An officer making a valid search must not resort to overly rigorous or drastic means.[5]

The defendants concede, as indeed they must,[6] that the officers were justified in making a search of the person of

---

1. See annotation 25 A.L.R.2d 1407.

2. Wherein the other similar cases are cited and discussed.

3. See Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; and cases there cited.

4. For example, after lawful arrest (Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145; United States

v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653) or by customs officers at a port of entry, etc. Title 19 U.S.C.A. §§ 482, 1581 and 1582; United States v. Yee Ngee How, D.C., 105 F.Supp. 517, and cases there cited.

5. United States v. Willis, D.C., 85 F.Supp. 745; In re Guzzardi, D.C., 84 F.Supp. 294.

6. See Footnote 4.

each defendant. They make no complaint of the manual or fluoroscopic examination performed by Dr. Lowry at his office. They contend, however, that when it was determined that the medicines should be administered, at that moment there arose the need for a warrant; and in the absence thereof the further search exceeded the Constitutional limitations.

I disagree that the necessity for a warrant is the question for determination. Where an officer armed with a warrant undertakes to make a search (or when proceeding without a warrant, where circumstances permit) and a casual or superficial examination reveals incriminating circumstances, I am aware of no rule of law which requires that he return to the magistrate to secure a second and more potent writ. The search may continue wheresoever the incriminating evidence points [7] without additional authorization.

The question here, as I see it, is whether the search, which was fully authorized by statute and precedent, became "unreasonable" as too rigorous and drastic under the circumstances which then prevailed. If so, then it contravenes the Fourth Amendment, not because made without a warrant, but because it exceeded reasonable bounds.

Where a search is undertaken legitimately, the lengths to which it may be pursued—and still retain its "reasonable" characteristic—vary with the circumstances of the case. Whether the conduct of an officer is reasonable depends in large measure on the reliability and extent of the information before him, and on which he acts; on the purposes he is undertaking to accomplish; and on the necessity of such means as he may employ. Obviously it would be a most mischievous thing should the customs officers subject every returning traveler to the indignity of a search of this character, or should they do so on speculation and surmise. But it would be equally mischievous to deny to these officers, who are charged with the duty of preventing the unlawful importation of such narcotics into the country, to pursue their search for such contraband to the spot where they know, with a high degree of certainty, that it is being secreted.

The search which customs officers are authorized to conduct upon entry of one into the country is of the broadest possible scope.[8] The propriety of the manual examination by the physician of the bodies of the defendants is not contested here, nor do the reported cases which have come to my attention condemn such a search when made under proper circumstances. Where every circumstance —including the admission of one of the defendants—points uniformly and unerringly to the location of the narcotics cache, is the officer's search to be limited by the length of the probing finger? Is the narcotic subject to seizure if secreted within two inches of the anus, but secure and exempt if perchance the smuggler may lodge it a greater distance within his intestine, or may retain it in his stomach until he has passed the inspection station. Such, I think, is not the law. Where the smuggler so degrades himself as to secrete the contraband in this fashion, the law is not powerless to cope with such tactics. The Fourth Amendment does not prevent its recovery because the hiding place is difficult of access or because its recovery causes some discomfort to him who placed it there. It is somewhat incongruous for the defendants here to complain that their dosage violated their Constitutional rights where it is perfectly obvious that they would have administered exactly the same treatment to themselves in making their own retrieve, had they again succeeded in avoiding detection. The search was not violative of the Fourth Amendment.

The contention that the Fifth Amendment was violated is no better taken. If the conduct of the officers was not "unreasonable" within contemplation of the

7.  See Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.

8.  United States v. Yee Ngee How, D.C., 105 F.Supp. 517 and cases there cited.

Fourth Amendment, certainly it was not so unconscionable or shocking to one's sense of justice as to run afoul of the due process requirements of the Fifth Amendment (Blackford v. United States, supra; Rochin v. People of California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183; Breithaupt v. Abram, 352 U.S. 432, 77 S. Ct. 408, 1 L.Ed.2d 448). Here no force whatsoever was employed by the officers. While I am sure the entire episode was not to the liking of the defendants, they made no complaint or protest, except to the extent noted above. Indeed, Michel cooperated with the officers throughout on learning of the danger to himself should the container develop a leak, and made an effort at self-induced nausea before taking the medicines. I find that Michel consented to all that was done in his case, and that King consented save for a temporary objection to taking the second dose.

The motions to suppress the evidence as having been procured through means violative of the rights of the defendants under terms of the Fourth and Fifth Amendments are not well taken, and are denied.