[Crim. No. 19243. Second Dist., Div. Two. Sept. 22, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY W. JONES, Defendant and Appellant.

202

**COUNSEL**

Richard S. Buckley, Public Defender, Harold E. Shabo, James L. McCormick, Thomas Patterson and Leighton A. Nugent, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and John R. Evans, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**HERNDON, J.**—Appellant was charged with possession of a restricted dangerous drug in the nature of a barbituric acid, to wit, sodium secobarbital, also known as seconal. Pursuant to the stipulation of counsel, and with the express approval of appellant, the cause was submitted upon the evidence received at the hearing on appellant's motion to suppress evidence and upon the testimony contained in the transcript of the preliminary hearing.

### Appellant's Contentions

On this appeal from the judgment of conviction appellant contends that a stomach lavage performed by a physician to whom he was taken following his ingestion of a number of capsules containing barbituric acid was a brutal and shocking procedure which denied him due process of law and which constituted an unreasonable search and seizure and a violation of his privilege against self-incrimination.

■■  Our review has led to the conclusion that appellant's contentions are devoid of merit. The testimony of the doctor who performed the stomach lavage provides convincing proof that the procedure followed was dictated by well founded medical opinion that there was a danger that appellant had ingested a lethal overdose of barbiturates. The evidence convincingly proves that the doctor was not the agent of the police and that the stomach lavage was performed because it was deemed necessary to remove from appellant's stomach a poison which threatened his life.

### Summary of the Evidence

Bruce Randall was a police officer for the City of El Monte assigned to narcotics investigation on May 7, 1970. At approximately 12:15 p.m. on that date he and his partner, Detective Scheidel, were on patrol in an

area near a high school. They had information that drugs were being sold at a location across from the high school. They had received two or three telephone calls that morning informing them that drugs were going to be dispensed at that location around noontime.

Randall was the passenger in Detective Scheidel's unmarked vehicle. They passed by the described location at about 10 miles per hour. About 100 feet south of the indicated location Randall observed appellant and his codefendant Meaders on the sidewalk in front of a building. Appellant and Meaders were three to four feet from the wall of the building, on the sidewalk and facing the street. The police vehicle was very close to the curb.

Officer Randall recognized appellant, who had been arrested before. Randall observed Meaders dropping red capsules, which appeared to be sodium secobarbital, into appellant's hand. Randall was familiar with red gelatin sodium secobarbital capsules, having seen thousands of them in the past. Officer Randall told Detective Scheidel to stop, and Randall jumped out of the car and ran toward appellant and Meaders. Randall thought he had seen three or four capsules drop into appellant's hand, although it could have been five or six because they were still dropping when Randall jumped out of the car. Randall identified himself and informed appellant and Meaders that they were under arrest.

At the time of his arrest appellant had the capsules in his hand, but immediately thereafter Officer Randall observed him thrust the capsules into his mouth and swallow them very quickly.

Appellant and Meaders were taken into custody and transported to the El Monte Police Department. Although appellant had not appeared intoxicated at the time of his arrest, during the next few minutes thereafter he began to develop noticeable symptoms of intoxication. His speech became slurred; his breathing became very shallow and soft. His legs became very rubbery, and he was having trouble maintaining his balance. The pupils of his eyes were dilating and vacillating. These were symptoms of a person under the influence of sodium secobarbital. Randall formed the opinion that appellant was under the influence of a barbiturate.

Because of his observation of appellant's developing symptoms, Randall decided to take him to the El Monte Medical Center for examination by a doctor to determine whether or not he had taken a dangerous overdose of drugs. At the medical center appellant was examined by a Dr. Vigil, who had been informed of the circumstances by Officer Randall. The doctor decided that appellant's stomach should be pumped without any suggestion or request by Officer Randall.

The court on its own motion called Dr. Vigil as a witness. He was employed as a medical doctor at the El Monte Medical Center on May 7, 1970. He examined appellant in the emergency room there. Prior to examining appellant he was told by Officer Randall in the hall that appellant had taken some sleeping pills. Dr. Vigil asked if the officers knew how many or what kind, and they replied in the negative.

The medical report indicated that prior to Dr. Vigil's examination, a nurse had written therein "Brought in by E.M.P.D. for ingestion of reds. Unknown amount. Stomach lavage, question mark." Dr. Vigil concluded that an indeterminate amount of barbiturates was involved, and that he should make an examination and determine the course of treatment. What the nurse had written was only a general history and was not regarded by the doctor as an order.

Dr. Vigil examined appellant and found him lethargic and sleepy. Appellant was oriented but "a lot more lethargic" than would be considered normal. Appellant was cooperative. Dr. Vigil examined appellant's reflexes and talked to him. No abnormality of pulse, respiratory rate, or the eyes was noted on the record.

Dr. Vigil's medical opinion was that there was a danger that appellant had ingested a lethal dose of barbiturates. He therefore decided to perform a gastric lavage of the stomach. He felt that it would not be wise to wait to see if a comatose condition or some other kind of trouble developed, because then a respirator or "more heroic means" of saving appellant's life might be required. There was a danger to appellant's life in stalling any medical procedure until appellant possibly became comatose. Thus, in Dr. Vigil's medical opinion, pumping appellant's stomach was "necessary in order to possibly save his life."

Dr. Vigil used water to pump appellant's stomach. He did not use an emetic because in the case of barbituric intoxication, the use of an emetic can cause deepening of an impending coma. Dr. Vigil told appellant what he was going to do, and appellant "was very cooperative." Dr. Vigil asked appellant to open his mouth in order to insert a tube into his stomach and "at no time did [appellant] object in any way." Dr. Vigil did not recall obtaining a consent document from appellant. As a general rule it was his practice to get a signed consent but in cases of cooperative patients or in apparent emergencies, the doctor frequently would proceed without a signed consent.

In performing a stomach lavage the patient is always strapped to the table in order to keep the patient and the mattress from sliding off the table. Appellant was handcuffed in front and strapped to the table across

206

his chest and legs while the doctor performed the stomach lavage. It was stipulated that People's Exhibit 1, a bottle of fluid from appellant's stomach, was examined by an expert forensic chemist and found to contain 13 milligrams percent of barbituric acid derivatives.

> *The Procedure Followed by the Police and by the Doctor in This Case Was not in the Slightest Degree Unreasonable, Shocking or Brutal; There Was no Unreasonable Search or Seizure nor any Violation of the Privilege Against Self-incrimination.*

It should not be forgotten that the course of events which led to the pumping of his stomach was initiated by appellant, who, caught in the act of dealing with dangerous drugs, attempted to destroy the evidence of his crime by thrusting the secobarbital capsules into his mouth and swallowing them. ■ There is no constitutional right to destroy evidence. (See *People* v. *Maddox,* 46 Cal.2d 301, 306 [294 P.2d 6].) ■ While physical evidence may not be "tortured" from a suspect's lips, the mouth is not "a sacred orifice into which contraband may be placed and thereafter disposed of in leisurely fashion." (*People* v. *Bass,* 214 Cal.App.2d 742, 746 [29 Cal.Rptr. 778].)

The use of body cavities by smugglers and dealers in narcotics is a well known fact of which the courts have taken judicial notice. (*Blefare* v. *United States,* 362 F.2d 870, 874.) The frequent attempts of users and sellers of dangerous drugs and narcotics to destroy the incriminating evidence by placing it in their mouths and swallowing it has become a matter of common knowledge. The courts have made it clear that the law is not powerless to deal with such tactics. (Cf. *Blackford* v. *United States,* 247 F.2d 745, 754, cert. den. 356 U.S. 914 [2 L.Ed.2d 586, 78 S.Ct. 672]; *King* v. *United States,* 258 F.2d 754, 755, fn. 6; *United States* v. *Michel,* 158 F.Supp. 34, 37.)

■ Invasions of the body of the accused may be made under certain circumstances without constituting a denial of due process or an unreasonable search or seizure, if done by medical personnel using proper medical procedures and if done without brutality which "shocks the conscience." (*Schmerber* v. *California* (1966) 384 U.S. 757, 759-760 [16 L.Ed.2d 908, 913, 86 S.Ct. 1826]; *Breithaupt* v. *Abram* (1957) 352 U.S. 432, 435-440 [1 L.Ed.2d 448, 450-453, 77 S.Ct. 408].)

Appellant relies upon *Rochin* v. *California,* 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396]. However, in *Rochin* there was not merely a stomach pumping but also an illegal forced entry into Rochin's

second story bedroom and an ensuing struggle during which the officers choked Rochin in an attempt to extract pills from his mouth. It was the entire course of conduct which shocked the conscience of the court. As the court stated, "Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach contents—this *course of proceeding* by agents of government to obtain evidence is bound to offend even hardened sensibilities. . . ." *Id.* at p. 172 [96 L.Ed. at p. 190]. (Italics added.)

Appellant contends that these additional factors were of minor import, and that in reality *Rochin* prohibits stomach pumping per se. The courts have taken a different view, however. *Rochin* has been distinguished in numerous cases on the ground that it was concerned not merely with stomach pumping but with the entire course of events. (*People* v. *Haeussler,* 41 Cal.2d 252, 259 [260 P.2d 8], cert. den. 347 U.S. 931 [98 L.Ed. 1082, 74 S.Ct. 533]; *People* v. *Woods,* 139 Cal.App.2d 515, 520-521 [293 P.2d 901], cert. den. 352 U.S. 1006 [1 L.Ed.2d 550, 77 S.Ct. 566]; *People* v. *Bass, supra,* 214 Cal.App.2d 742, 744; *Lane* v. *United States,* 321 F.2d 573, 576, cert. den. 377 U.S. 936 [12 L.Ed.2d 299, 84 S.Ct. 1340], 381 U.S. 920 [14 L.Ed.2d 440, 85 S.Ct. 1551]; *Blefare* v. *United States, supra,* 362 F.2d 870, 875-876.)

Furthermore, the use of emetics to procure the contents of an accused's stomach has been upheld in several cases since *Rochin.*

In *Blefare* v. *United States, supra,* Blefare was suspected of carrying heroin in his stomach as he had done on a previous occasion. When he failed to drink a saline solution to induce vomiting, the doctor suggested a tube procedure. A soft polyethylene tube was passed through the nose, down the throat and into the stomach. Fluid was induced into the stomach by gravity, causing vomiting. Blefare did not consent to this procedure. Two agents held his arms while a third held his head, and the doctor inserted the tube. Blefare expelled two packets of heroin.

The court held that the search was reasonable and did not shock the conscience. "There is no evidence of brutality," it said, "Each appellant was restrained with only the force necessary to permit an emetic to be delivered into his stomach to remove its contents."

In *King* v. *United States, supra,* 258 F.2d 754, 755, certiorari denied 359 U.S. 939 [3 L.Ed.2d 639, 79 S.Ct. 652], the court approved the decision and opinion of the lower court, *sub nom. United States* v. *Michel,* 158 F.Supp. 34. Each of the two defendants Michel and King had swallowed a rubber sheath containing heroin. These objects were revealed in a fluoroscopic examination. The doctor administered epsom salts. Michel

vomited up his packet. King failed to vomit after a second dose, but the packet eventually was expelled through the alimentary canal. Although the trial court relied primarily on consent, it found that King did not consent to the second dosage. The court also found the search to be reasonable and not to be shocking or unconscionable. In *Barrera* v. *United States,* 276 F.2d 654, the *King* case was followed in upholding the use of an emetic causing regurgitation.

In *Lane* v. *United States, supra,* 321 F.2d 573, certiorari denied 377 U.S. 936 [12 L.Ed.2d 299, 84 S.Ct. 1340], the use of an emetic was approved where, although the defendant was reluctant to take it, he did so without the use of force.

Aside from these cases upholding the use of various emetic devices to procure the contents of a defendant's stomach, another line of cases upholds reasonable searches of the rectum. In *People* v. *Woods, supra,* 139 Cal.App.2d 515, certiorari denied 352 U.S. 1006 [1 L.Ed.2d 550], a doctor using a rubber glove inserted his finger in the defendant's rectum over his "protest" but without the use of force, and with very little pain. The court distinguished *Rochin* and found the conduct not brutal or shocking. The action was also upheld in subsequent federal habeas corpus proceedings. (*Application of Woods,* 154 F.Supp. 932, certificate of probable cause denied, 249 F.2d 614, cert. den. 356 U.S. 921 [2 L.Ed.2d 716, 78 S.Ct. 705].)

A leading federal case is *Blackford* v. *United States,* 247 F.2d 745, certiorari denied 356 U.S. 914 [2 L.Ed.2d 586, 78 S.Ct. 672]. There a rectal probe by a physician using medically approved procedures was upheld. The search was approved despite the defendant's refusal to cooperate and the necessity to use some force in the examination. (See also *Rivas* v. *United States,* 368 F.2d 703, 709-711, cert. den. 386 U.S. 945 [17 L.Ed.2d 875, 87 S.Ct. 980]; and *Denton* v. *United States,* 310 F.2d 129, 133.)

Appellant contends that respondent may not rely upon the federal border cases because border searches have "special rules applicable." However, the only indicated reason border searches are different from other kinds of searches is that *probable cause is not required,* as is indicated by the very authorities which appellant cites. (See also *Rivas* v. *United States, supra,* 368 F.2d 703, 709, cert. den. 386 U.S. 945 [17 L.Ed.2d 875, 87 S.Ct. 980].) There is no question of probable cause here, for Officer Randall saw appellant swallow the capsules. That border searches may be made without probable cause does not affect the question of the reasonableness of the *method* used to search the body once it has been determined to make a search. That federal courts, absent the additional factors in *Rochin,* have found that the use of emetics to cause regurgitation

is not a shocking or brutal procedure clearly indicates the untenability of appellant's basic contention.

As our summary of the evidence reveals, the doctor construed appellant's failure to object or to resist and his apparent willingness to cooperate as an indication of consent. Certainly this was a reasonable construction. By the same token the evidence supports the finding that appellant consented. It is most reasonable to assume that appellant did not wish to commit suicide and that his cooperation was motivated by his desire to live.

However, as the decisions above cited indicate, appellant's consent was not required. (*Blefare* v. *United States, supra,* 362 F.2d 870, 872; *Blackford* v. *United States, supra,* 247 F.2d 745, 752, cert. den. 356 U.S. 914 [2 L.Ed.2d 586].) This is conceded by an authority relied upon by appellant. (*Vasquez* v. *Superior Court,* 199 Cal.App.2d 61, 65 [18 Cal.Rptr. 140].) Similarly, the taking of blood tests from an unconscious patient, obviously without consent, has been upheld. (*Breithaupt* v. *Abram,* 352 U.S. 432, 435-436 [1 L.Ed.2d 448, 451, 77 S.Ct. 408]; *People* v. *Lane,* 240 Cal. App.2d 634, 636 [49 Cal.Rptr. 712]; *People* v. *Bustos,* 247 Cal.App.2d 422, 424 [55 Cal.Rptr. 603].)

Moreover, the fact that the defendant did not actively resist has been regarded a significant factor in a number of cases. For instance, in *United States* v. *Michel, supra,* 158 F.Supp. 34, 38, affirmed. *King* v. *United States, supra,* 258 F.2d 754, 755-756, certiorari denied 359 U.S. 939 [3 L.Ed.2d 639] the trial court found consent except as to one episode where the defendant King refused to take epsom salts, but the court also said, "Here no force whatsoever was employed by the officers. While I am sure the entire episode was not to the liking of the defendants, they made no complaint or protest, except to the extent noted above."

Similarly, in *Lane* v. *United States, supra,* 321 F.2d 573, 576, certiorari denied 377 U.S. 936 [12 L.Ed.2d 299], 381 U.S. 920 [14 L.Ed.2d 440], the court said, "Here no force was used in the search. Lane was hesitant to take the emetic, but he did take it himself without any violence from the agents. Lack of force is not controlling [citations] but is a factor indicative of reasonableness." (See also *People* v. *Woods, supra,* 139 Cal.App.2d 515, 517, cert. den. 352 U.S. 1006 [1 L.Ed.2d 550], wherein the defendant protested and his hand was held by agents to prevent interference in rectal probe otherwise without force.)

Whether the cited cases be construed as "consent" cases or as merely standing for the proposition that the search is more clearly reasonable where the defendant does not forcibly resist, the evidence in the instant case proves

that appellant did not resist and strongly supports the finding that he consented. As we have pointed out, Dr. Vigil testified that appellant was "very cooperative." and did not "object in any way" when the doctor explained what he was going to do.

■ We have summarized the substantial evidence that the medical procedure followed in this case was necessary to save appellant's life, or at least that the doctor reasonably so believed. This is essentially a question of fact for the trial court which should be upheld if there is evidence to support it. (*People* v. *Gallegos,* 13 Cal.App.3d 239, 243 [91 Cal.Rptr. 517].)

In *People* v. *Roberts,* 47 Cal.2d 374, 377-378 [303 P.2d 721], it is stated that necessity often justifies a trespass in order to save life. In *People* v. *Neth,* 5 Cal.App.3d 883, 887 [86 Cal.Rptr. 12], the court states: "Several California cases have recognized the principle that in emergency situations it is proper for the police to conduct a search in order to assist medical personnel in diagnosis and treatment of the victim." (See also *People* v. *Gallegos, supra,* 13 Cal.App.3d 239, 243; *People* v. *Roman,* 256 Cal.App.2d 656, 659-660 [64 Cal.Rptr. 268]; *People* v. *Gomez,* 229 Cal. App.2d 781, 783 [40 Cal.Rptr. 616]; *People* v. *Dickenson,* 210 Cal. App.2d 127, 134-135 [26 Cal.Rptr. 601].)

Appellant's contention that the medical procedure followed in this case violated his privilege against self-incrimination is clearly without merit. ■ The privilege against self-incrimination applies only to testimonial communications of the accused, and not to real evidence such as that obtained in this case. (*Schmerber* v. *California, supra,* 384 U.S. 757, 760-765 [16 L.Ed.2d 908, 914-917, 86 S.Ct. 1826]; *People* v. *Ellis,* 65 Cal.2d 529, 533 [55 Cal.Rptr. 385, 421 P.2d 393]; *People* v. *Sudduth,* 65 Cal.2d 543, 546 [55 Cal.Rptr. 393, 421 P.2d 401]; *People* v. *Duroncelay,* 48 Cal.2d 766, 770 [312 P.2d 690].)

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 18, 1971.