[Crim. No. 19905. May 16, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
LANE W. SCOTT, Defendant and Appellant.

**COUNSEL**

Bruce Robert Kay, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz, Shunji Asari and Theodora Berger, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHARDSON, J.**—Defendant appeals from a judgment of conviction after jury trial on an information charging four counts of child molestation (Pen. Code, § 288) and four counts of incest (*id.,* § 285). We will sustain his principal contention that the results of a medical test ordered by the court should have been suppressed, and will reverse the judgment. For the guidance of court and counsel on retrial, we will also dispose of certain other claims of error.

In June or July of 1974, the complaining witness, then 13 years old, came to live with her parents, defendant and his wife. For various reasons, the three had never before been together as a family, and his daughter could not recall having seen defendant previously. An affectionate relationship developed between father and daughter, which, according to her testimony, soon involved improper and criminal behavior. In August 1974 she engaged in a "French kissing" episode with defendant, and thereafter according to her, defendant had intercourse with her on four occasions between September 1974 and January 1975.

She did not immediately report the foregoing incidents to anyone, but revealed them in May 1975 when her grandmother, with whom she was then living, had her examined medically to learn the cause of a vaginal discharge. Dr. Fletcher, a pediatrician, diagnosed a nonspecific vaginal infection. A subsequent examination by Dr. Woodling in early June of 1975 revealed the presence of trichomoniasis, an infection primarily transmitted through intercourse. When questioned by the physician, the minor admitted that she had had sexual relations with her father, but with no one else.

In September 1975, just prior to trial, the People moved to have defendant medically tested for trichomoniasis. The motion was supported by two declarations, one from the deputy district attorney prosecuting the case, and one from Dr. Woodling. In summary, these documents described the results of the daughter's examination, the usual method of transmission of trichomoniasis, and her statements that defendant was the only person with whom she had had intercourse. Dr. Woodling asserted in his declaration that trichomoniasis organisms are often present in the male genital tract and remain unless treated. The routine test for trichomoniasis, as he described it, consisted of a manual massage of the prostate gland administered through the rectum and causing a discharge of a sample of semen. Dr. Woodling said the 15-minute examination was not painful and "would have approximately a seventy percent probability of showing whether or not a male had trichomoniasis."

On the basis of this information, and over defendant's objection, the court ordered the requested examination which was then conducted. While the results of the test were "negative" for trichomoniasis specifically, they did reveal a chronic prostate inflammation, of which trichomoniasis was one of three probable causes. These results were introduced by the People at trial without further objection by defendant.

On appeal defendant asserts that the court-ordered test violated his constitutional rights against self-incrimination, and to be free from unreasonable searches and seizures (U.S. Const., Amends. IV, V, XIV, § 1; Cal. Const., art. I, §§ 13, 15) and his right to privacy (Cal. Const., art. I, § 1). There is merit in defendant's argument that the test constituted an unreasonable search and seizure, and that admission of its results was prejudicial.

Preliminarily, we dispose of the People's contention that defendant waived his objections, first, by failing to raise them with sufficient specificity before the trial court, and second, by declining to renew them after the test results were known. We cannot accept the contention.

At the hearing on the motion to compel the examination, defense counsel stated: "The basic opposition is, your Honor, it's not relevant . . . ." After an extended discussion of that issue counsel said he also understood that the examination was "rather demeaning . . . quite demeaning . . . ." Counsel then urged that the procedure was more intrusive than a blood test, but made no specific constitutional reference and cited no authorities. The People urge that counsel's efforts were insufficient to raise any constitutional questions.

■ An objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide. (Code Civ. Proc., §§ 646, 647; *Cooper* v. *Mart Associates* (1964) 225 Cal.App.2d 108, 118 [37 Cal.Rptr. 145]; *Grossblatt* v. *Wright* (1951) 108 Cal.App.2d 475, 481 [239 P.2d 19].) In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented. (*People* v. *Bolinski* (1968) 260 Cal.App.2d 705, 722-723 [67 Cal.Rptr. 342]; see *People* v. *Briggs* (1962) 58 Cal.2d 385, 409-410 [24 Cal.Rptr. 417, 374 P.2d 257].) The transcript of the hearing on the motion to compel the examination reveals that the trial court fully understood and considered the nature of the constitutional challenges which defendant now raises. Under the particular circumstances, we therefore hold defendant's objections on this ground were not waived by any lack of specificity.

The People further argue that defendant should have renewed his objections by means of a motion to suppress evidence under Penal Code section 1538.5 after the test results were made available. Under that section, the only prerequisite to post-conviction review of defendant's objections to evidence illegally seized is that a motion to suppress be

made "at some stage of the proceedings prior to conviction . . . ." (*Id.,* subd. (m).) Moreover, where defendant's objections have been fully considered and overruled, we have said that they need not be repetitiously renewed. (See *People* v. *Briggs, supra,* 58 Cal.2d 385, 410.) Here, the record reflects that the admissibility of the results, whatever the outcome of the test, was in issue and fully explored at the hearing on the original motion. Thus, we conclude that the requirements of section 1538.5 were met.

■ We are unable to find a waiver in defendant's spirited attempts to persuade the jury in closing argument that the test results tended to establish his innocence. The People suggest that defendant's conduct at trial went beyond mere "defensive acts" (*People* v. *Sam* (1969) 71 Cal.2d 194, 207 [77 Cal.Rptr. 804, 454 P.2d 700]; *Jameson* v. *Tully* (1918) 178 Cal. 380, 384 [173 P. 577]), and that defendant decided not to oppose admission of the test results once he learned that they were "negative" for trichomoniasis. We decline, however, so to speculate when the *People,* equally aware of the possible interpretations of the results, chose to introduce them as part of their case in chief. Concluding, as we do, that defendant has not waived his challenge to admission of the test evidence, we turn to the merits of his constitutional claims.

Preliminarily, we reject defendant's contention that the test violated his rights against self-incrimination under the Fifth Amendment because the privilege against self-incrimination is limited to the involuntary giving of testimonial or communicative evidence. It does not extend, as here, to "real or physical" evidence extracted under compulsion. (*Gilbert* v. *California* (1967) 388 U.S. 263, 266 [18 L.Ed.2d 1178, 1182, 87 S.Ct. 1951]; *Schmerber* v. *California* (1966) 384 U.S. 757, 761 [16 L.Ed.2d 908, 914, 86 S.Ct. 1826].)

Defendant's principal argument is that the test violated his constitutional rights to be protected from unreasonable searches. ■ It is well settled that unjustified intrusions beneath the body's surface may violate a suspect's "due process" rights guaranteed by the Fifth and Fourteenth Amendments (*Rochin* v. *California* (1952) 342 U.S. 165, 172-174 [96 L.Ed. 183, 190-191, 72 S.Ct. 205, 25 A.L.R.2d 1396]), and may also contravene the Fourth Amendment's proscription against "unreasonable" searches. (*Schmerber* v. *California, supra,* 384 U.S. at pp. 769-771 [16 L.Ed.2d at pp. 919-920].) A warrantless invasion of the body must be incident to a valid arrest (*People* v. *Superior Court (Hawkins)* (1972) 6 Cal.3d 757, 762-763 [100 Cal.Rptr. 281, 493 P.2d 1145]) and may occur only under a

limited range of exigent circumstances. These circumstances include the need to prevent loss or destruction of evidence, or the existence of a medical emergency. (*People* v. *Bracamonte* (1975) 15 Cal.3d 394, 401-403 [124 Cal.Rptr. 528, 540 P.2d 624]; see *People* v. *Jones* (1971) 20 Cal.App.3d 201, 210 [97 Cal.Rptr. 492].)

Moreover, because of the Fourth Amendment's particular solicitude for "personal dignity and privacy," warrantless searches of the body's interior cannot be justified on the "mere chance" that desired evidence will be obtained, but must be founded on a "clear indication" that such evidence will be found. (*Schmerber, supra,* 384 U.S. at pp. 769-770 [16 L.Ed.2d at p. 919].) In *Bracamonte,* we held that the "clear indication" test applicable to bodily intrusions required "more than probable cause" to believe that the search would produce relevant results. (15 Cal.3d at p. 403.)

Finally, the degree of the intrusion, reliability and humaneness, and the conditions under which it is performed have been considered in deciding whether a warrantless intrusion was "reasonable." Thus, blood tests for alcohol, performed under medical conditions, have been consistently upheld as routine, minor, and highly reliable (*Schmerber, supra,* 384 U.S. at pp. 770-771 [16 L.Ed.2d at p. 919]; *Breithaupt* v. *Abram* (1957) 352 U.S. 432, 439 [1 L.Ed.2d 448, 452-453, 77 S.Ct. 408]; *People* v. *Duroncelay* (1957) 48 Cal.2d 766, 772 [312 P.2d 690]), while more substantial invasions have been subjected to stricter scrutiny (e.g., *Bracamonte, supra,* 15 Cal.3d at pp. 401-402, 404-405).

We expressly reserved in *Bracamonte* the question "of when, if at all, a search warrant may issue authorizing an intrusion into a suspect's body." (15 Cal.3d at p. 400, fn. 3.) That question is now squarely presented, because the requirements for the court-ordered medical test of the type here at issue can be no less than those required for issuance of a search warrant. (For convenience, references in the ensuing discussion to the term "warrant" will accordingly be understood to include any form of prior judicial authorization for a physical search. No "warrant," in the generally accepted meaning of that term is involved here.)

■ The Fourth Amendment prohibits *all* "unreasonable" searches, whether conducted pursuant to a warrant or not. (*United States* v. *Lefkowitz* (1932) 285 U.S. 452, 464 [76 L.Ed. 877, 882, 52 S.Ct. 420, 82 A.L.R. 775].) "Reasonableness" is determined by balancing " 'the need to search . . . against the invasion which the search . . . entails.' " (*Terry* v.

*Ohio* (1968) 392 U.S. 1, 21 [20 L.Ed.2d 889, 905, 88 S.Ct. 1868], quoting *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 537 [18 L.Ed.2d 930, 940, 87 S.Ct. 1727].)

■ The human body is not, of course, a sanctuary in which evidence may be concealed with impunity. (E.g., *People* v. *Sanders* (1969) 268 Cal.App.2d 802, 804 [74 Cal.Rptr. 350].) Appropriate procedures to retrieve such evidence are neither "unreasonable" per se under the Fourth Amendment, nor violations of "due process" procedures guaranteed by the Fifth and Fourteenth Amendments. (*Bracamonte, supra,* 15 Cal.3d at p. 405; see *Rochin* v. *California, supra,* 342 U.S. 165, 172-174 [96 L.Ed. 183, 190-191]; *People* v. *Mora* (1965) 238 Cal.App.2d 1, 4 [47 Cal.Rptr. 338]; *People* v. *Bass* (1963) 214 Cal.App.2d 742, 746-747 [29 Cal.Rptr. 778].)

On the other hand, *Schmerber, Hawkins,* and *Bracamonte,* all *supra,* have made clear that the circumstances which permit penetrations beyond the body's surface are particularly limited, since such intrusions may readily offend those principles of dignity and privacy which are protected by the Fourth Amendment. The requirement that penetrations of the body be founded on strong showings of need are in large measure applicable equally to searches with and without a warrant.

■ We therefore hold that where a warrant authorizing a bodily intrusion is sought, the issuing authority after finding probable cause to believe the intrusion will reveal evidence of crime, must apply an additional balancing test to determine whether the character of the requested search is appropriate. Factors which must be considered include the reliability of the method to be employed, the seriousness of the underlying criminal offense and society's consequent interest in obtaining a conviction (cf. *Breithaupt* v. *Abram, supra,* 352 U.S. 432, 439 [1 L.Ed.2d 448, 453]; *People* v. *Duroncelay, supra,* 48 Cal.2d 766, 772), the strength of law enforcement suspicions that evidence of crime will be revealed, the importance of the evidence sought, and the possibility that the evidence may be recovered by alternative means less violative of Fourth Amendment freedoms. (Cf. *Bracamonte, supra,* 15 Cal.3d at pp. 403-404.)

These considerations must, in turn, be balanced against the severity of the proposed intrusion. Thus, the more intense, unusual, prolonged, uncomfortable, unsafe or undignified the procedure contemplated, or the more it intrudes upon essential standards of privacy, the greater must be the showing for the procedure's necessity.

Thus, in some cases, an intrusion will not be justified even where there is probable cause to believe the proposed search will produce relevant evidence. We do not suggest, however, that the People must always demonstrate a "clear indication," amounting to *"more than probable cause,"* to believe that relevant evidence will be recovered (*Bracamonte, supra,* 15 Cal.3d at p. 403, italics added) before a warrant or order authorizing *any* bodily intrusion may be obtained. *Schmerber's* requirement that *warrantless* searches proceed only upon a "clear indication" of success was intended to counter the assumption then prevalent that lawful arrests permitted virtually *unrestricted* warrantless searches of the suspect's person and premises. (384 U.S. at pp. 769-770 [16 L.Ed.2d at p. 919], citing, inter alia, *United States* v. *Rabinowitz* (1950) 339 U.S. 56, 72-73 [94 L.Ed. 653, 663-664, 70 S.Ct. 430] (dis. opn. of Frankfurter, J.); *Weeks* v. *United States* (1914) 232 U.S. 383, 392 [58 L.Ed. 652, 655, 34 S.Ct. 341]; but see *Chimel* v. *California* (1969) 395 U.S. 752, 755-768 [23 L.Ed.2d 685, 689-696, 89 S.Ct. 2034].) Resort to a warrant obviates this problem and should be encouraged. Little of value would be gained by judging the most minor intrusion pursuant to warrant by a standard *greater* than probable cause.

■ Applying the above standards to the facts before us, we conclude that the People's showing in support of its request for the test here at issue was inadequate to justify it. The intrusion contemplated was very substantial, consisting essentially of a prolonged massage of the prostate gland, through the rectum, to induce involuntary ejaculation. This constituted a very significant invasion of both dignity and privacy. There was no evidence whatever that this was a procedure which was routinely conducted in medical examinations, and the trial judge so conceded. Involving as it did the most intimate of bodily functions, traditionally and universally regarded as private, we think it is as extreme as the forced regurgitation at issue in *Bracamonte* and *Rochin,* both *supra.*

Furthermore, the evidence sought to be obtained, though possibly "relevant" in the broadest sense of the term (see Evid. Code, § 351), was highly circumstantial and speculative. Information supporting a court-ordered search must be timely. (*Alexander* v. *Superior Court* (1973) 9 Cal.3d 387, 393 [107 Cal.Rptr. 483, 508 P.2d 1131]; *People* v. *Nadell* (1972) 23 Cal.App.3d 746, 755 [100 Cal.Rptr. 444].) The more remote the incidents relied upon, the less probable it is that probative evidence will be discovered. Here, the presence of the infection in September 1975 would not have established its existence the previous January, when the

last alleged act of intercourse occurred. Conversely, a negative test in September would not assure that defendant had *not* infected his daughter in January, since interim treatment might have alleviated the condition. Additionally, the test lacked reliability. (See *Schmerber, supra,* 384 U.S. at pp. 770-771 [16 L.Ed.2d at pp. 919-920].) The People's showing was that the procedure had "approximately a seventy percent probability" of demonstrating whether defendant had trichomoniasis; at trial it was explained that "positive" results were a reliable indicator of the infection, but that if the results were "negative" there remained a 30 percent statistical chance that the infection was nonetheless present. Thus, not only was the procedure not a "highly effective means" of establishing the presence or absence of trichomoniasis, its unreliability was biased against the defendant. We do not decide here whether results of this procedure might be inadmissible under any circumstances as having as yet an insufficient scientific acceptance (see, e.g., *People* v. *Kelly* (1976) 17 Cal.3d 24, 29-40 [130 Cal.Rptr. 144, 549 P.2d 1240]); we simply conclude that, under constitutional protections against unreasonable searches and seizures, the test here employed was not sufficiently reliable to permit the substantial involuntary intrusion into defendant's person.

The People urge that the requirements for authorization of bodily intrusions should be relaxed in sex cases because of the peculiar need to produce evidence either to corroborate or rebut the evidence of the complaining witness. (Cf. *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 882 [123 Cal.Rptr. 119, 538 P.2d 247].) The balancing test set forth above allows for just such problems of proof in particular cases by inviting consideration of the seriousness of the crime, the importance of the evidence sought, and the likelihood of its recovery by less intrusive means. However, it is precisely the general paucity of independent evidence which renders the criminal defendant in a sex case particularly vulnerable to questionable efforts at obtaining "corroboration." Here, we have concluded, those efforts violated constitutional standards.

Was admission of the fruits of the illegal search harmless beyond a reasonable doubt? (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065], rehg. den., 386 U.S. 987 [18 L.Ed.2d 241, 87 S.Ct. 1283].) We conclude that it was not. Paradoxically, the questionable relevance of the test evidence, which points to our conclusion of inadmissibility, also argues against a finding of prejudice. Nonetheless, we cannot say that admission of the evidence was harmless beyond a reasonable doubt.

As in many sex cases, the jury essentially was faced with a credibility contest between the complaining witness and the defendant. The written record suggests that the prosecutrix was a convincing witness; the details of her testimony were not inherently improbable and were not impeached on cross-examination. Psychiatric testimony supported her credibility on major issues. Her trichomoniasis infection suggested strongly that she had had relations with someone at some time. Dr. Woodling testified that his physical examination suggested intercourse at or about the time of the incidents charged. There was some evidence from which the jury could infer defendant's consciousness of guilt. On the other hand, defendant's denials of impropriety were equally vigorous, though his testimony and that of other witnesses revealed certain inferentially incriminating episodes. The medical evidence was necessarily inconclusive as to the time of intercourse. Moreover, it was conceded that the complaining witness had lied in the past to avoid punishment for petty misbehavior.

The People introduced the test evidence with the explanation that, despite the "negative" results, there remained a 30 percent chance that defendant had trichomoniasis at the time of his examination. The jury was also told of the prostate inflammation and the possibility that it had been caused by trichomoniasis. The People obviously intended the jury to draw the conclusion that defendant had transmitted the infection to his daughter. Though the probative value of this evidence was weak, we cannot say with assurance that the jury disregarded it, and therefore must reverse the judgment.

This result makes it unnecessary for us to reach defendant's alternative arguments that admission of the test evidence was an abuse of discretion (Evid. Code, § 352), and that the test is rendered unreliable and therefore inadmissible under the scientific-acceptance rule. (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30.)

Defendant seeks a complete dismissal of the charges against him because his conviction was not supported by substantial evidence. We reject the contention. ■ The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable. The rule is applicable to sex cases. (*People* v. *Sylvia* (1960) 54 Cal.2d 115, 122 [4 Cal.Rptr. 509, 351 P.2d 781]; *People* v. *Ozene* (1972) 27 Cal.App.3d 905, 910 [104 Cal.Rptr. 170].) As previously noted, the complaining witness' testimony was neither inherently improbable nor wholly uncorroborated. Defendant

points to evidence tending to undermine her credibility, but this affects only the weight which the jury will give her testimony. There is no basis for a dismissal.

■ For guidance in any retrial, we consider defendant's contention that the trial court erred in presenting CALJIC instruction No. 10.35 to the jury. We agree that the instruction was improperly given. CALJIC instruction No. 10.35 permits the jury to consider uncharged lewd acts between the defendant and a minor prosecutrix as evidence of defendant's lewd disposition toward the child, thus tending to establish intent to commit the charged offenses. (See Evid. Code, § 1101, subd. (b).) His daughter testified to an incident subsequent to the first alleged act of intercourse in which she and defendant, while watching television with Mrs. Scott, exchanged touches in the genital area. Defendant and Mrs. Scott confirmed that the minor had touched defendant, but their version of events suggested the gesture had not been returned, and that defendant had been shocked and offended by her conduct.

Where the sole evidence of uncharged sexual conduct is the uncorroborated testimony of the prosecutrix herself, it is inadmissible since it contributes nothing to a determination of her credibility on the charged offenses and is highly prejudicial. (*People* v. *Stanley* (1967) 67 Cal.2d 812, 817 [63 Cal.Rptr. 825, 433 P.2d 913].) If, on retrial, prosecutrix' testimony appears to be the only basis for a reading of CALJIC instruction No. 10.35, it should therefore not be given. Moreover, if the prosecution can offer no corroboration for her charge that defendant participated in the lewd conduct, all evidence concerning it should be excluded from any retrial.

Defendant has advanced several additional claims of trial court error including (1) refusal to order an independent psychiatric examination of the prosecutrix, (2) permitting impeachment of a defense witness with a police report describing uncharged homosexual activity by defendant, (3) admitting medical testimony as to whether and when the minor had intercourse, and (4) denying probation. Defendant also claims ineffective assistance of counsel in the failure to object to the giving of CALJIC instruction No. 2.52 (flight after crime). We have carefully examined each of these contentions and agree in each instance with the conclusion reached by the majority of the Court of Appeal in rejecting the claims as lacking merit. (*People* v. *James* (1977) 19 Cal.3d 99, 118 [137 Cal.Rptr. 447, 561 P.2d 1135].)

The judgment is reversed.

Tobriner, J., Mosk, J., Manuel, J., and Newman, J., concurred.

Bird, C. J., concurred in the result only.

**CLARK, J.,** Dissenting.—Applying the balancing test set forth in the majority opinion, I conclude that the medical examination ordered by the court did *not* constitute an unreasonable search or seizure under the circumstances.

Stating the factors to be weighed in the balance, the majority hold that "where a warrant authorizing a bodily intrusion is sought, the issuing authority after finding probable cause to believe the intrusion will reveal evidence of crime, must apply an additional balancing test to determine whether the character of the requested search is appropriate. Factors which must be considered include the reliability of the method to be employed, the seriousness of the underlying criminal offense and society's consequent interest in obtaining a conviction . . . , the strength of law enforcement suspicions that evidence of crime will be revealed, the importance of the evidence sought, and the possibility that the evidence may be recovered by alternative means less violative of Fourth Amendment freedoms. . . .

"These considerations must, in turn, be balanced against the severity of the proposed intrusion. Thus, the more intense, unusual, prolonged, uncomfortable, unsafe or undignified the procedure contemplated, or the more it intrudes upon essential standards of privacy, the greater must be the showing for the procedure's necessity." (*Ante,* p. 293, citations omitted.)

*The severity of the proposed intrusion.* It is appropriate to begin discussion with this factor for, as the majority recognize, it is the most important of the several variables. "[T]he more intense, unusual, prolonged, uncomfortable, unsafe or undignified the procedure contemplated, or the more it intrudes upon essential standards of privacy, the greater must be the showing for the procedure's necessity." (*Id.*) Conversely, of course, the less severe the proposed intrusion, the lesser the requisite showing of, for example, reliability.

In this case there was *uncontradicted* evidence that the intrusion was minor. The People's evidence was presented by means of declarations

filed in the trial court, defendant offering no evidence to the contrary, either before or after the examination. In his declaration Dr. Woodling stated that the examination ordered here—manually massaging the prostate through the rectum to obtain a semen sample—takes about 15 minutes and is not painful. In rejecting defendant's Fourth Amendment claim, the Court of Appeal observed, "prostatic examinations are a routine form of examination, conducted by urologists for many urinary disorders."

The Ninth Circuit has held that the gentle probing of the rectum incident to a rectal search, or any other body cavity search conducted in a medically approved manner, is not a degrading or shameful physical assault as those terms were used in *Rochin* v. *California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396]. Indeed, the court stated that a rectal search is a less pronounced intrusion than the puncturing of the skin pursuant to a blood test. (*Rivas* v. *United States* (9th Cir. 1966) 368 F.2d 703, 711; see also *Blackford* v. *United States* (9th Cir. 1957) 247 F.2d 745, 752-753.) The *Blackford* court said of the rectal search in that case "As to the actual physical examinations, they were conducted by qualified physicians, under sanitary conditions, with the use of medically approved procedures. This kind of examination is a routine one which countless persons have undergone. It is an uncomplicated and nonhazardous procedure. It normally is not painful to a healthy person." (*Id.,* at p. 752.)

Indeed, the majority appear to concede that this examination was not especially "intense, unusual, prolonged, uncomfortable [or] unsafe," for their conclusion that it was "severe" is based, instead, on the ground that it significantly invaded defendant's "dignity and privacy." (*Ante,* p. 294.)

The short answer to this objection is that defendant should have looked to his dignity before he molested his daughter. In rejecting the claim that a rectal search is an affront to dignity, Judge Chambers in his concurring opinion in *Blackford* v. *United States, supra,* aptly observed: "[A]s I see it, the Supreme Court's policy is to uphold human dignity. . . . [¶] But here it was Blackford who created, who first takes us into this disgusting sequence. . . . I do not say that the depraved have no rights. But I do say that to my sensibilities all of the shockingness was Blackford's." (247 F.2d at p. 754.)

As for privacy, investigation of sex offenses, by virtue of the subject matter, involves inquiry into matters ordinarily considered private. The

nature of the proof is such that the physical evidence, if any, is likely to be derived from a private portion of the defendant's body. (See, e.g., *Brent* v. *White* (5th Cir. 1968) 398 F.2d 503, 509 (scraping of defendant's penis to determine whether there was evidence of victim's menstrual blood permitted in rape case); *Commonwealth* v. *Tarver* (1975) — Mass. — [345 N.E.2d 671, 676] (taking of pubic hair samples of accused upheld in case involving sexual assault of a child); *State* v. *Riley* (1975) 303 Minn. 251 [226 N.W.2d 907, 909] (police permitted to conduct in-custody close-range inspection of defendant's penis without a warrant in a rape case where the victim had described sores on penis of her assailant). Certainly the victim of a sexual assault can attest to the fact that investigation of such a crime necessarily involves what would otherwise be an intolerable invasion of privacy—the protocol for medical treatment of such a victim includes an examination of her entire body for evidence of force or trauma, a thorough pelvic examination, taking of evidentiary smears from the appropriate orifice (vagina, anus or mouth—depending on the nature of the assault) and combing for foreign pubic hair. (See, e.g., Queen's Bench Foundation Rape Victimization Study, Preliminary Research Findings and Recommendations (1 Jan. 1975) pp. 32-33.)

In conclusion, the examination ordered here was not especially "intense, unusual, prolonged, uncomfortable [or] unsafe." Nor, given the nature of the crimes charged, was it unreasonably offensive to defendant's dignity or invasive of his privacy. The less severe the proposed intrusion, the lesser the showing that need be made as to the other factors to be weighed in the balance. Bearing this principle in mind, we now consider those factors.

*The possibility that the evidence may be recovered by alternative means less violative of Fourth Amendment freedoms.* This factor clearly weighed in favor of performing the examination, for defendant has never argued, nor do I understand the majority to now suggest, that a specimen could have been obtained by an "alternative means less violative of Fourth Amendment freedoms."

*The seriousness of the underlying criminal offense and society's consequent interest in obtaining a conviction.* This factor too weighed heavily in favor of the examination. The Legislature manifestly considered the charged crimes to be "serious" for when these offenses were committed and tried the penalty for incest was imprisonment for one to fifty years and the penalty for child molestation was one year to life imprisonment. Moreover, the charged offenses were aggravated insofar as the victim of

the incest was a child and the alleged molestation of that child consisted in completed acts of sexual intercourse. Consequently, society had great interest in obtaining available evidence supporting a conviction. Indeed, the majority do not contend otherwise.

*The strength of law enforcement suspicions that evidence of crime will be revealed.* This factor also supports the trial court's order. Defendant's daughter had trichomoniasis. Trichomoniasis is acquired through intercourse. The child had had intercourse with defendant and with no one else.[1] Therefore, she must have gotten trichomoniasis from defendant. If defendant had not been treated in the interim, he would still have trichomoniasis. If defendant did still have trichomoniasis there was a 70 percent chance that the test would reveal it. Clearly there was probable cause to believe that evidence of defendant's alleged crime would be revealed by the examination.

*The importance of the evidence sought.* Sex offenses almost always occur in private, the only direct witnesses being the prosecuting witness and the defendant. Conviction therefore hinges upon the credibility of the prosecuting witness. (*People* v. *Covert* (1967) 249 Cal.App.2d 81, 88 [57 Cal.Rptr. 220].) In offenses of the sort committed here this problem is exacerbated by the prosecuting witness' being a child. Question will arise as to whether the child distinguishes between truth and fantasy and appreciates her responsibility to tell the truth. (See, e.g., *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].) It is therefore invaluable in such a case to have circumstantial evidence tending to prove guilt *or innocence.* Certainly defense counsel recognized the value of this evidence insofar as it tended to prove defendant's innocence, for in closing argument he told the jury "I think the medical testimony is about the best thing that an innocent man . . . can do to disprove any insinuation of guilt."

*The reliability of the method to be employed.* To characterize this procedure as 70 percent reliable is misleading. Admittedly, there is a 30 percent probability that the test will not reveal the presence of trichomoniasis in a man having the infection. But the important question is whether one is justified in placing confidence in a test result indicating that the subject does have trichomoniasis. The answer to that question is, as the majority concede, that the reliability of "positive" results is unchallenged.

---

[1] The child so testified and as she was the victim of the crime her testimony was entitled to credit for the purpose of determining whether to perform the examination. (See *People* v. *Ramey* (1976) 16 Cal.3d 263, 268-269 [127 Cal.Rptr. 629, 545 P.2d 1333].)

Having carefully weighed each of the aforementioned factors, I conclude that the examination did not constitute an unreasonable search or seizure and therefore would affirm the judgment.