Filed 1/27/15  P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C071975 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F01545) |
| v. | |
| RICHARD STEVEN JOHNSON, JR., | |
| Defendant and Appellant. | |

A jury convicted defendant Richard Steven Johnson, Jr., of lewd and lascivious acts by force or violence on a minor under the age of 14 (Pen. Code, § 288, subd. (b)(1))[1] and sustained an allegation that he kidnapped his victim in the commission of the crime (§ 667.61, subd. (d)(2)).  The trial court sentenced defendant to 25 years to life in state prison.

---

[1] Undesignated statutory references are to the Penal Code.

On appeal, defendant contends accommodations made to the complaining witness violated his right to confrontation and there is insufficient evidence to support the true finding on the kidnapping allegation. We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Crime*

#### *The Prosecution's Case*

In February 2009, 13-year-old A.S. lived at home with her mother S.S. and some of her siblings. Her sister J.S. lived in a separate apartment with her boyfriend—defendant—and their baby daughter.

On February 28, 2009, defendant asked A.S. to go to the store with him and buy tampons for J.S. He did not want to buy tampons because he was a man. He drove A.S. to Foods Co., where she bought tampons for defendant.

Rather than taking her home, defendant drove A.S. to a place she did not know. The place was about 15 minutes from the store and had a parking lot and buildings that looked like warehouses. A.S. felt she could not escape because there was no one else in the area. After parking, defendant got out of the car, opened the passenger door, and ordered A.S. into the trunk. A.S. got out of the car and defendant pushed her into the trunk.

Defendant drove the car for a "pretty long" time. She did not know where she was when defendant stopped and opened the trunk. The place looked like a forest and she could not get away. Defendant then sexually assaulted A.S. in the back seat of the car. He told A.S. not to tell anyone and dropped her off near her home. A.S. went to a friend's house before going home.

S.S. became worried when A.S. did not return home after several hours. A.S. said she was going with defendant; S.S. tried to call her after a few hours but got no answer.

2

S.S. knew something was wrong when A.S. finally returned home, as her daughter's clothes were torn and her hair was messed up. S.S. asked what was wrong; A.S. said, "Mom, he lied to me." A.S. then told S.S. about the sexual assault, after which S.S. called the police.

A.S. was taken to the hospital for a medical examination. An officer who contacted her at the hospital found A.S. was crying and upset. She said defendant picked her up at around 10:55 a.m., took her to Foods Co., and then later struck her and forced her into the trunk of the car. Defendant had sex with her even though she told him not to. He dropped her off at an elementary school rather than her home.

J.S. testified she did not ask defendant to buy her tampons that day. He was supposed to pick up their daughter from S.S.'s home and return in time to take J.S. to work. J.S. called defendant when he did not return; defendant said he was fixing the car. She told an officer that defendant sounded "weird" and said he was out with A.S. when she talked to him on the phone that day.

A.S. told the examining nurse practitioner that defendant sexually assaulted her around noon that day. Defendant also backhanded her in the face and grabbed her by the arm during the assault. The nurse saw A.S. had a laceration and bruise on her elbow as well as dried blood in her nose. The gynecological exam found tearing of the hymen indicating a penetrating injury with a large object; the injuries were consistent with sexual assault.

A search of defendant's car revealed a Foods Co. receipt for the purchase of a box of tampons on February 28, 2009, at around 10:39 a.m. DNA taken from A.S.'s vagina and panties matched defendant's with probabilities of a random match ranging from one in 340 trillion to one in 130 quintillion. DNA from a swab taken from defendant's penis matched A.S.'s DNA with probabilities of a random match ranging from one in three million to one in 170 million. DNA swabs from a legal pad in the back seat of

3

defendant's car, shorts found in the trunk, and from the trunk itself matched A.S.'s with probabilities of a random match ranging from one in 300 quadrillion to one in 9 quintillion.

A.S. gave a special assault forensic evaluation interview on March 2, 2009. A recording of the interview was played to the jury.

*The Defense*

A defense investigator interviewed A.S. on March 2, 2009. A.S. told the investigator defendant tried to kiss her. She denied being in the trunk of the car, and said sex may or may not have happened.

A nurse testifying as an expert in sexual assault examinations testified that an examination cannot determine whether the sex was consensual. She opined that the findings in this case could be consistent with consensual sex.

### A.S.'s Testimony

The direct examination of A.S. began with general questions about her and her family, which she answered without a problem. She then admitted not wanting to testify, and having said so to the prosecutor in an e-mail. After A.S. answered general questions about her sister J.S. and defendant, the prosecutor asked her about the events surrounding the sexual assault. A.S. answered some of the questions, but to others, she gave replies like, "I can't do this" or, "Can I leave?" She soon asked to take a break, and the trial court ordered a 15-minute recess.

During the recess, defense counsel moved for a mistrial based on a violation of defendant's right to due process. In support of the motion, counsel relied on A.S. being brought into the courtroom through a back door rather than the normal means of entry. Counsel noted that A.S., who was sitting next to a victim's advocate, cried during most of her testimony and continually stated that she did not want to testify. Admitting that these

4

facts may not individually support a due process violation, counsel asserted that their cumulative effect deprived defendant of his right to a fair trial. The trial court disagreed and denied the motion.

When examination resumed, A.S. was able to answer questions about her sister's car and her desire to get a job, without any problem. As questioning moved to the events on the day of the sexual assault, she answered some questions, but others were answered with statements like, "I can't do this, I told you," or, "I don't remember." When the prosecutor asked A.S. whether she got in the trunk of defendant's car on the day of the incident, she replied, "I can't do this. I can't testify. Can I leave?" The prosecutor switched to asking A.S. about her reluctance to testify. She replied that it was because she was embarrassed and not because she was afraid of hurting her sister.

A.S. was initially able to answer the prosecutor's questions as the examination went into the events after the sexual assault. When the prosecutor again asked her about the events leading up to the sexual assault, A.S. increasingly answered with, "I don't remember" or, "I don't want to talk about it." The trial court called a break after she answered consecutive questions with, "Can I leave?" and, "I can't do this."

During the break, defense counsel said A.S. had replied she did not want to talk about it 12 to 14 times. Counsel renewed the due process objection, which the trial court denied.

Following the recess, the prosecutor asked to have A.S. give written answers during the examination. The trial court agreed. During the rest of A.S.'s direct and cross-examination, she gave her answers in writing, which were then read by the trial court.

The defense later renewed the objection. Defense counsel asserted A.S. effectively chose which questions she was going to answer before she wrote the answers

5

down by stating she did not want to be there more than 14 times in reply to questions. When A.S. wrote down her answers, her back was turned to counsel and the jury might not have been able to see her and assess her credibility. Counsel additionally asserted that the act of writing the answers to her cross-examination rather than facing counsel and answering prevented effective cross-examination.

The trial court found the defense had ample opportunity to cross-examine A.S., and she answered every one of the defense questions. The court stated that A.S. was "extremely emotional" before she was allowed to write down her answers. A.S. "was crying when she first entered," and was especially emotional "when she was asked questions specifically related to the alleged offense[s]." In deciding to allow A.S. to give written answers, the trial court relied on "the age of the witness now, the age of the witness when these offenses allegedly occurred, the nature of the charges, the violent nature of the charges, the sexual nature of the charges," and the court's observation of A.S.

The trial court additionally noted that it read the answers in a "speakable" but "emotionless" manner. A.S. did turn her back to defendant after the last break, and turned away from counsel when she wrote her answers. The trial court found this was part of A.S.'s demeanor that the jury could take into account. Denying defendant's motion, the trial court concluded by stating, "these slight deviations from regular practice were necessary to facilitate taking of the evidence and to facilitate the search for the truth, which this process is all about."

## DISCUSSION

### I. Defendant's Right of Confrontation

Defendant contends his right to confrontation was violated when the trial court allowed the victim "to testify without speaking and without allowing the jury and defendant to face and confront her." We disagree.

The confrontation clause of the Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." In *Coy v. Iowa* (1988) 487 U.S. 1012, 1016 [101 L.Ed.2d 857, 864], the court, stressing the time-honored view that face-to-face confrontation was essential to fairness, observed "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." The court held that placing a screen between the complaining witnesses and defendant violated defendant's right to a face-to-face encounter. (*Id.* at p. 1020 [101 L.Ed.2d at p. 866].) The *Coy* decision left for another day whether there were exceptions to the right of face-to-face confrontation. (*Id.* at p. 1021 [101 L.Ed.2d at p. 867].)

Although the *Coy* court did not address exceptions to the right to confrontation, it did find limits to what was guaranteed by that right. Specifically, the right to a face-to-face confrontation did not mean that the witness must look at defendant. "The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions." (*Coy v. Iowa*, *supra*, 487 U.S. at p. 1019 [101 L.Ed.2d at p. 866].)

In *Maryland v. Craig* (1990) 497 U.S. 836, 857 [111 L.Ed.2d 666, 686], the court held the confrontation clause did not prohibit a child witness from testifying against a defendant at trial, outside defendant's presence, by a one-way closed circuit television to protect the child from trauma that would impair the child's ability to communicate where

7

the reliability of the evidence is ensured by subjecting it to rigorous adversarial testing. The requisite finding of necessity to depart from face-to-face confrontation must be case specific; the court must hear evidence and determine the procedure is necessary to protect the welfare of the particular child witness. (*Id.* at p. 855 [111 L.Ed.2d at p. 685].) The court must find the child witness would be traumatized by the presence of defendant and that such emotional distress is more than de minimis. (*Maryland*, at p. 856 [111 L.Ed.2d at p. 685].)

*People v. Sharp* (1994) 29 Cal.App.4th 1772 (*Sharp*), disapproved on other grounds in *People v. Martinez* (1995) 11 Cal.4th 434, 452, is an example of how the right to confrontation is satisfied so long as the witness is cross-examined in the courtroom in the defendant's presence. In *Sharp*, the prosecutor stood or sat next to the witness stand so the child witness did not have to look at defendant. Defendant could see the side and back of the witness's head while she testified; even if he could not see all her facial expressions, he could see her general demeanor and reactions to questioning. The witness could, but chose not to, see defendant and the jury could see both the witness and defendant. (*Sharp*, *supra*, at pp. 1781-1782.) The Court of Appeal found the situation "not materially different from one in which a witness might stare at the floor, or turn her head away from the defendant while testifying." (*Id.* at p. 1782.)

The *Sharp* court rejected the defendant's contention that his confrontation rights were violated. "Surely, appellant cannot be claiming a constitutional right to stare down or otherwise subtly intimidate a young child who would dare to testify against him. Nor can he claim a right to a particular seating arrangement in the courtroom. A witness who avoids the gaze of the defendant may be exhibiting fear, embarrassment, shyness, nervousness, indifference, mendacity, evasiveness, or a variety of other emotional states or character traits, some or all of which might bear on the witness's credibility. [¶] It is, however, the function of the jury to assess such demeanor evidence and 'draw its own

8

conclusions' about the credibility of the witness and her testimony. [Citation.] There was no interference with the jury's ability to perform that function in this case." (*Sharp*, *supra*, 29 Cal.App.4th at p. 1782.)

The California Supreme Court relied on *Sharp i*n reaching a similar conclusion in *People v. Gonzales* (2012) 54 Cal.4th 1234 (*Gonzales*). *Gonzales* involved the murder by torture of a four-year-old girl by her uncle, the defendant, with whom she was living. (*Gonzales*, at pp. 1242-1243.) The People were allowed to admit the videotaped preliminary hearing testimony of the defendant's eight-year-old son, Ivan, Jr., at trial after the trial court found that the trauma Ivan, Jr., would suffer from testifying rendered him unavailable. (*Id.* at pp. 1247, 1261.) At the preliminary hearing, Ivan, Jr., was allowed to sit at an angle, not directly facing the defendants.[2] (*Gonzales*, at p. 1265.) The podium was placed "so that the lawyers had eye contact with the witnesses during questioning, and the witnesses were free to look around the courtroom and make eye contact with [the] defendants, if they desired." (*Ibid*.)

The Supreme Court found this arrangement did not violate the defendant's right to face-to-face confrontation. (*Gonzales*, *supra*, 54 Cal.4th at p. 1266.) In support of its conclusion, the high court cited and quoted from *Sharp*, which involved the same seating arrangement as in *Gonzales*. (*Gonzales,* at p. 1267.) In *Gonzales*, the trial court made extensive findings that testifying against the defendant would traumatize the witness. (*Id.* at p. 1268.) The "seating arrangement at the preliminary hearing satisfied the central concerns of the confrontation clause: 'physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.' " (*Ibid.*) Accordingly, the defendant's right

---

[2] Ivan, Jr.'s mother was prosecuted in a separate capital trial. (*Gonzales*, *supra*, 54 Cal.4th at p. 1261.)

9

to confrontation was not violated by the use of the videotaped preliminary hearing testimony.  (*Ibid.*)

There is no meaningful distinction between A.S.'s refusal to face defendant or counsel and what was held not to violate the right to confrontation in *Sharp* and *Gonzales*.  Since there is no right to have the witness look at defendant or defense counsel, it was not necessary for the trial court to make the findings required by *Maryland*.  Nonetheless, the trial court here made findings that the witness was traumatized based on its own observations of her, the nature of the alleged crimes, and the victim's age.  While the trial court did not hear testimony or take evidence on the trauma from testifying, detailed findings are not required when any infringement on the right to confrontation is de minimis.  (See *Gonzales*, *supra*, 54 Cal.4th at p. 1267 ["the less the intrusion on Sixth Amendment rights, the less detail is required in a trial court's findings," citing *Ellis v. U.S.* (1st Cir. 2002) 313 F.3d 636, 650].)  A.S.'s refusal to face defendant or counsel did not violate defendant's right to confrontation.

Allowing A.S. to give some of her testimony in writing likewise does not infringe on the Sixth Amendment right.  Numerous witnesses testify through intermediaries without violating a defendant's right to confrontation.  The right to confrontation does not prohibit a deaf witness from testifying through a sign language interpreter.  (*People v. Younghanz* (1984) 156 Cal.App.3d 811, 819.)  Witnesses not capable of testifying in English are allowed to testify through interpreters without violating the right to confrontation.  (See *People v. Roberts* (1984) 162 Cal.App.3d 350, 356 [use of interpreter not on statutorily required list of court-approved interpreters does not violate right to confrontation without a showing of prejudice]; Evid. Code, § 752 [procedure for appointing interpreters for witnesses].)  A.S. was not able to give spoken answers to questions about the details of the sexual assault.  Allowing her to write down the answers and have them read by the trial court was no different than allowing a deaf witness or a

10

witness who does not speak English to communicate his or her answers to the jury through an interpreter.  As in those situations, accommodating the witness here did not violate defendant's right to confrontation.

## II.  Sufficiency of the Evidence

Defendant contends there is insufficient evidence to support the true finding on the kidnapping special allegation.[3]  He claims there was insufficient evidence to find he moved the victim a substantial distance that increased the risk of harm to her.  His contention borders on the frivolous.

In determining the sufficiency of the evidence, we ask whether " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Hatch* (2000) 22 Cal.4th 260, 272, italics omitted.)  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  "The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable."  (*People v. Scott* (1978) 21 Cal.3d 284, 296.)

Section 667.61 incorporates the standard for aggravated kidnapping by requiring that "the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense . . . ." (§ 667.61, subd. (d)(2); see *People v. Rayford* (1994) 9 Cal.4th 1, 11-12, 22.)

---

[3]  In addition, defendant claims, "the evidence was insufficient as to count 2," defendant's conviction for lewd and lascivious acts by force or violence on a minor under the age of 14.  This claim is made without a separate heading and without any supporting authority or factual analysis.  It is therefore forfeited.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error."].)

11

The aetivaation element for aggravated kidnapping requires only movement more than incidental to the crime, which substantially increased the danger beyond that inherent in the crime. This conclusion may be based on any of the following factors: Defendant decreased the likelihood of being detected by moving the victim out of the way; the danger was increased to the victim based on the victim's foreseeable attempt to escape; or the movement enhanced the defendant's opportunity to commit the crime. (*People v. Jones* (1997) 58 Cal.App.4th 693, 713.)

Here, substantial evidence supports the jury's asportation finding. Defendant moved A.S. against her will twice. First he drove about 15 minutes from the store to a warehouse area where no one was around. Taking advantage of the isolated location, defendant forced A.S. into the trunk and drove her to a wooded location where defendant sexually assaulted her. Moving A.S. to increasingly isolated areas decreased defendant's chance of being caught and foreclosed the possibility of her escaping. The fact that A.S. spent part of the trip in the trunk of a car increased the danger of the kidnapping.

Since the asportation clearly increased the danger to the victim beyond that inherent in the crime, the true finding on the aggravated kidnapping enhancement is supported by substantial evidence.

### DISPOSITION

The judgment is affirmed.

                                        BUTZ            , J.

We concur:


        BLEASE        , Acting P. J.


        MAURO        , J.