Filed 6/17/15  In re M.G. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re M.G., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B259988 (Super. Ct. No. 1436375) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD WELFARE SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> T.R. et al., <br><br> Defendants and Appellants. | |

T.R. (Mother) and M.G. (Father) appeal orders of the juvenile court terminating their parental rights to their child M.G. (hereafter "the child" or "M.G."). (Welf. & Inst. Code, § 366.26.)[1]  We conclude, among other things, that:  1) the Santa Barbara County Child Welfare Services (CWS) gave sufficient notice to three Indian tribes regarding the child's family ancestry under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.), and 2) the juvenile court did not err by ruling that ICWA did not apply.  We affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

FACTS

In 2013, Mother and the child "tested positive for opiates at the time of the child's birth." Mother admitted using methamphetamine, marijuana, "and Norco which was not prescribed to her during her pregnancy."

CWS filed a juvenile dependency petition (§ 300) alleging Mother's "continued drug use during her pregnancy" and "refusal to seek drug treatment" place the child at "substantial risk of physical harm." CWS alleged that Father's "engagement in criminal activity, including aggressive behaviors and substance abuse," places the child at a substantial risk of abuse and neglect. CWS removed the child from the home. The juvenile court declared M.G. to be "a person described by Welfare & Institutions Code § 300." CWS recommended that Mother receive family reunification services and participate in a case plan including drug treatment.

The juvenile court terminated Father's family reunification services at the six-month prepermanency hearing. After 12 months of services, the court terminated Mother's family reunification services. On September 29, 2014, the court terminated Mother's and Father's parental rights to the child.

*ICWA*

At the February 21, 2013, detention hearing, the juvenile court said, "I have to find out from you if you have any Native American Indian heritage and, if so, what tribe." Mother responded: "No, I'm not sure." Father's counsel responded that, "as far as [Father] knows, [Father] has no Native American Indian heritage."

Mother subsequently claimed she had "Cherokee [Indian] heritage through her [mother]."

CWS interviewed family members to obtain information about the family's ancestral history. It then mailed completed ICWA-030 notice forms to the three Cherokee Indian tribes and the Bureau of Indian Affairs.

The Eastern Band of Cherokee Indians determined that M.G. "is neither registered nor eligible to register as a member of this tribe."

2

The United Keetoowah Band of Cherokee Indians in Oklahoma determined that there "is no evidence that supports" M.G. is descended "from anyone on the Keetoowah Roll."

The Cherokee Nation tribe responded, stating it could not verify whether the child had Indian heritage from its tribe. It needed additional information, including, among other things, dates of birth for some ancestors. In bold highlighted letters, it said it needed the middle name of the child's great-great-great-grandfather [B.W.] and "also his wife's name." (We use initials instead of the family members' full names for confidentiality purposes.)

CWS responded to the tribe's letter. It said, "Our Department only sends ICWA-030 notices after all avenues of research have been completed, therefore we have already supplied your tribe with as much information as possible. Our notice provided all information known to the family."

On April 10, 2013, the Cherokee Nation tribe responded stating, "As we stated in our previous letter(s) to you, Cherokee Nation Indian Child Welfare received the above information from your office requesting a determination of tribal eligibility. However, the information you originally sent was not complete and it was impossible to validate or invalidate Cherokee heritage without more information."

CWS filed an interim review report and requested the juvenile court to make a finding "that ICWA does not apply." The report included the tribes' responses and an "ICWA Matrix" that summarized CWS's ICWA investigation.

Mother, Father and their counsel were present at the August 5, 2013, hearing. Counsel for CWS asked the juvenile court to "make a finding as to ICWA." Mother's counsel and Father's counsel said they "submitted." They made no objection to the report and did not request to introduce any additional information. The court ruled, "I'll make a finding that the Indian Child Welfare Act does not apply based on the information that we've received."

3

*ICWA*

Mother and Father contend they are entitled to a "conditional reversal of the order terminating parents' rights" because CWS did not comply with its ICWA investigation and notice duties. We disagree.

"[S]ocial services agencies have an affirmative duty to inquire at the outset of the proceedings whether a child who is subject to the proceedings is, or may be, an Indian child." (*In re K.M.* (2009) 172 Cal.App.4th 115, 118-119.) Under ICWA, they must give notice to the Indian tribes so they may "ascertain a child's status" from a review of tribal records. (*Id.* at p. 119.) "'The notice must include: *if known*, (1) the Indian child's name, birthplace, and birth date; (2) the name of the tribe in which the Indian child is enrolled or may be eligible for enrollment; (3) names and addresses of the *child's parents, grandparents, great grandparents*, and other identifying information . . . .'" (*Ibid.*, italics added.)

The social worker is required to interview "'the parents, Indian custodian, and extended family members to gather the information.'" (*In re C.Y.* (2012) 208 Cal.App.4th 34, 39.) But "neither the court nor [CWS] is required to conduct a comprehensive investigation into the minor's Indian status." (*Ibid.*) The goal is "to provide the Indian tribe with *all available information* about the child's ancestors." (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703, italics added.)

CWS contends the record shows that it made a reasonable investigation of the family ancestral history and provided all available information to the tribes. We agree.

The CWS social worker conducted interviews with relatives after learning that the child might have an Indian heritage. Father said he did not have any Indian heritage. CWS obtained his family's ancestral history from an aunt. She provided the names of the paternal grandparents and the paternal great-grandparents. With the exception of the child's father, the paternal family ancestral history reflected that all of the ancestors were born in Mexico.

Mother initially told CWS that her child "has no known Indian ancestry." Later, during questioning by the juvenile court, Mother said she was "not sure" if she had "any Native American Indian heritage." Mother subsequently told CWS that she had "Cherokee heritage through her [mother, A.A.]."

The social worker interviewed A.A., the child's maternal grandmother. The social worker also interviewed E.S., the child's maternal great-grandmother, to obtain information "about their Cherokee Indian heritage." They told the social worker that "they do not know of any family members being enrolled" in a tribe. They provided CWS with extensive "family heritage information." That information included the names of the child's maternal grandmother and maternal grandfather, the names of her maternal great-grandmothers and her maternal great-grandfather, her maternal great-great-grandmother and her maternal great-great-grandfather, and her maternal great-great-great-grandfathers, B.P. and B.W. They provided CWS with the information they knew about their ancestors' places of birth, dates of birth, dates of death and claimed Indian heritage or lack of Indian heritage.

CWS sent ICWA notices to the Bureau of Indian Affairs and to the three official Cherokee tribes. Two of the tribes--the United Keetowah Band of Chereokee Indians and the Eastern Band of Cherokee Indians--were able to make the determination that M.G. was not eligible for tribal membership from the information provided by CWS.

The Cherokee Nation tribe responded that the ICWA information it received from CWS was "not complete" and consequently it could not make a determination of tribal ancestry. It noted the ICWA form did not include a date of birth for one maternal grandmother and the two great-great-great-grandfathers. As to maternal great-great-great-grandfather B.W., it said his middle name was not included nor was his wife's name.

Mother and Father argue the tribe's letter shows CWS did not perform its duty to obtain Indian ancestry information. We disagree. The absence of some information about some ancestors does not mean CWS failed to perform its ICWA duties. It was required to provide the tribes with "all *available* information" about the child's ancestors. (*In re Francisco W.*, *supra*, 139 Cal.App.4th at p. 703, italics added.) The

5

ICWA-030 notice form, "Notice of Child Custody Proceeding for Indian Child," was written to anticipate that social services agencies might not be able to obtain all family history information. The form provides, "*Indicate if any of the information requested below is unknown . . . .*" In its ICWA matrix document, CWS documented its efforts during a four-month period (February 21, 2013, through May 6, 2013) to obtain ICWA information and the determinations of Indian status by the tribes.

CWS social worker Stephanie Morgan stated in a declaration that she had provided "*all information* I/*we have* about the relatives" on the ICWA tribal notice form. (Italics added.) Another CWS social worker said: 1) CWS "completed" all "avenues of research" before sending the ICWA-30 notices to the tribes, 2) CWS supplied "*as much information as possible*" to the tribes, and 3) "[o]ur notice *provided all information known to the family*." (Italics added.) This evidence supports a finding that CWS submitted all available information to the tribes.

Mother and Father contend CWS relied on A.A. and E.S., but did not interview other family members who *might* have had additional information. Their arguments are based on assumptions and speculation. For example, Father states, "*There is no information in the Record* to suggest that mother's brother" and other relatives were "interviewed by CWS." (Italics added.)

CWS worker Christine LaRocco said, "Our Department conducted a *thorough search* to obtain family ancestry information *by contacting all family members known to our agency*." (Some italics deleted.) That document is part of the evidence in the record.

Mother and Father claim the juvenile court erred by relying on LaRocco's statement about her "supposedly 'diligent' inquiry" because it conflicts with other documents in "the record." They apparently focus on LaRocco's statement about "contacting all family members" and believe it was not credible because she did not "provide the details" and her statement was not included in other CWS documents, such as the ICWA matrix document.

6

We do not decide credibility; that is a matter exclusively for the trial court. (*People v. Maury* (2003) 30 Cal.4th 342, 403; *People v. Scott* (1978) 21 Cal.3d 284, 296-297.) The court could reasonably infer LaRocco's statement supplemented the matrix information and was not in conflict with it. But if there was an evidentiary conflict, this was a matter for the trial court to resolve. (*Ibid.*) Given the court's findings, we must presume it resolved any conflict against appellants. (*Ibid.*)

Mother claimed Indian heritage through A.A., her mother. Consequently, interviewing A.A. was reasonable and appropriate. But CWS did not stop there. It also interviewed E.S., the child's great-grandmother. A.A. and E.S. told CWS, "There are no other people that they know of *that would have additional information*." (Italics added.) That supports a finding that no other family members would have information regarding the great-great-great-grandfathers. Mother and Father do not cite evidence supporting a contrary finding or specifically describe what other information is available regarding these ancestors.

Mother and Father claim CWS should have been able to provide more detailed information about the child's maternal great-great-great-grandparents after receiving the Cherokee Nation's first letter. They contend it ignored the tribe's request for additional information. But that is not the case. CWS responded to the tribe and noted that it had exhausted "all avenues of research" and it had no additional information.

Moreover, as CWS notes, it provided information about five generations of family history, which is substantially more than what ICWA regulations require (*In re K.M.*, *supra*, 172 Cal.App.4th at p. 119), and it did not have to conduct an independent "comprehensive" family history data search. (*In re C.Y.*, *supra*, 208 Cal.App.4th at p. 39.)

The Cherokee Nation's letter lists the information CWS provided. The tribe noted that CWS had provided: 1) the name and date of birth of the child's father, 2) the name and date of birth of the child's mother, 3) the name and date of birth of the maternal grandmother, 4) the name and date of birth of the maternal great-grandmother, 5) the name and year of birth of the maternal great-great-grandmother, 6) the name and date of birth of the maternal grandfather, 7) the name and date of birth of the maternal great-grandfather,

7

8) the name and date of birth of the maternal great-great-grandfather, and 9) the names of the maternal *great-great-great-grandfathers*.

Mother and Father note the Cherokee Nation requested the *middle name* of maternal *great-great-great-grandfather* B.W. They suggest CWS did not properly perform its duties because it did not supply that information. But their argument assumes that B.W. had a middle name. Mother's family provided CWS the full first and last name of this ancestor. Mother and Father have cited no evidence and have made no showing that the name provided to the tribe was incorrect, incomplete or that B.W. ever had a middle name. They consequently have not met their burden on appeal. (*In re D.W.* (2011) 193 Cal.App.4th at pp. 417-418.)

We have reviewed Mother's and Father's remaining contentions and we conclude they have not shown trial court error or grounds for reversal.

The judgments and orders are affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.

8

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

_____

Pamela Deavours, under appointment by the Court of Appeal, for Defendant and Appellant M.G.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant T.R.

Michael C. Ghizzoni, County Counsel, Toni Lorien, Deputy Counsel, for Plaintiff and Respondent.