Filed 8/26/20  P. v. Badio CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEXANDER BADIO,<br><br>    Defendant and Appellant. | B298367<br><br>(Los Angeles County<br>Super. Ct. No. LA086982) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Martin L. Herscovitz, Judge. Affirmed in part and remanded with direction.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Appellant Alexander Badio was convicted of multiple crimes after sexually assaulting two women. On appeal, he contends 1) the evidence was insufficient to support his conviction on one count of sexual penetration by a foreign object (Pen. Code,[1] § 289, subd. (a)(1)(A)); 2) the court should have instructed the jury on two sexual battery offenses (§ 243.4, subds. (a) & (e) (1)) as lesser included offenses of sexual penetration by a foreign object; 3) the trial court erred by instructing the jury with CALCRIM No. 1191B; and 4) his indeterminate sentence of 30 years to life constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and the California Constitution. The Attorney General urges the court to reject Badio's arguments but argues the matter must be remanded for resentencing because the trial court erroneously sentenced Badio under the "One Strike" law, section 667.61, subdivisions (b) and (e)(4), for an offense that is not eligible for sentencing under that statute. We remand for resentencing but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On two separate occasions in early 2017, Badio approached a vulnerable woman and offered her assistance, then sexually assaulted her. With respect to M.A., Badio was charged with sexual penetration by a foreign object (count 1); rape of an unconscious person (§ 261, subd. (a)(4)) (count 2); and assault with intent to commit a felony (§ 220, subd. (a)(1)) (count 3). As to D.O., Badio was charged with sexual penetration by a foreign

---

[1]     Unless otherwise indicated, all further references are to the Penal Code.

object (count 5); sexual battery by restraint (§ 243.4, subd. (a)) (count 6); false imprisonment by violence (§ 236) (count 7); rape (§ 261, subd. (a)(2)) (count 8); attempted sodomy by use of force (§§ 664/286, subd. (c)(2)(A)) (count 9); and dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)) (count 10). Badio was convicted by a jury of all counts except count 9 (attempted sodomy by use of force).

## I.   **Prosecution's Case-in-Chief**

### A.   *D.O.*

D.O. testified that in February 2017, she was an 18-year-old student staying in Los Angeles without family or close friends nearby. Badio approached her while she was waiting for her bus near the North Hollywood train station. He said he was a personal trainer and promised to give her a membership to his gym so that she could work out with him.

D.O. and Badio scheduled a workout for February 24, 2017. That night, he picked her up at a convenience store. She believed they were going to go to a gym. He drove around for approximately one hour, then parked the car and told her that he would give her a massage before their workout. D.O. did not agree to a massage. Badio pulled out massage oil or lotion and began touching D.O.'s breasts and vagina underneath her clothing. He kissed her, but she did not kiss him back. Badio inserted his fingers into her vagina, causing her pain. D.O. told him to stop several times before he stopped. She tried to get out of the car, but the doors were locked and Badio told her it was not safe outside.

3

Badio drove for another 30 minutes. More than once D.O. tried to get out of the car when they stopped at a red light, but Badio grabbed her arm and prevented her from leaving. It was late at night when Badio parked the car and angrily told her to get out of the car. D.O. was afraid, but she did not try to run because she was unfamiliar with the area.

Badio took D.O. into a house. She thought they were going to pass through the house and then go to the gym. Badio brought her into a bedroom, took her phone, dragged her onto a bed, and began touching her. He held her down on the bed with one arm and inserted the fingers of his other hand into her vagina. D.O. was crying and telling him no, but he did not stop.

Badio undressed D.O. and himself. He yelled at her and called her obscene names. He touched her all over her body, including her breasts, buttocks, and vagina. He placed his erect penis in D.O.'s vagina and thrust his body against hers while holding her down with his legs and hands. Badio unsuccessfully attempted to insert his penis into her anus, and then he reinserted it in her vagina. D.O. continued to cry and to tell him to stop, but he did not stop.

Badio instructed D.O. to fellate him, pulled her face toward his penis, and pulled her hair. D.O. turned her head away, but he pulled her back. Badio tried twice more to place his penis in her mouth but was unsuccessful. He inserted his fingers into D.O.'s vagina a third time, then placed his penis inside her vagina again. He held her down and painfully pushed his body against hers. Next, Badio removed his penis from D.O.'s vagina and briefly forced her to put her mouth on it. He inserted his penis in D.O.'s vagina a fourth time, and he slapped her, hard, on her back.

Badio forced D.O. to lie on the bed while he touched her. He would not allow her to dress and claimed not to know where her phone and purse were. D.O. told him she wanted to leave, but Badio told her it was too late at night and held her tightly so she could not leave the bed.

At some point, D.O. dressed and tried to leave. Badio blocked the door at first, but she was able to leave when he stepped away from the door to prevent her from finding her purse and phone. Badio followed D.O., called her names, told her not to call the police, and threatened he would find her if she reported him to the police. D.O. feared Badio would harm her.

D.O. eventually reported the incident to the police and underwent a limited sexual assault examination. The forensic nurse examiner who examined her testified that D.O. had redness, bruising, and abrasions in the genital area consistent with repeated nonconsensual digital and penile penetration. D.O. complained of tenderness, and the pelvic examination was so painful for her that the examiner could not insert a speculum to perform an internal examination.

B. *M.A.*

M.A. testified that as of early 2017 she was a college student without stable housing: she showered at a gym and slept on the Red Line train, at a North Hollywood fast food restaurant, or in the gym. She did her homework at the school library until it closed for the night, at which time she studied at a coffee shop. She had no money, and she carried her possessions in a rolling suitcase.

In February 2017 M.A. met Badio while she was on her way to the coffee shop after the library closed. She accepted his offer of a ride because she was encumbered by her suitcase.

5

Badio also offered to buy M.A. a meal.  M.A. thought Badio was "okay at first."  He bought her coffee and told her about himself.  M.A. thought, "[T]his is okay.  This is safe enough."  M.A. never told anyone that she was homeless, but she told Badio that she was "in between places" to live.

Badio offered to let M.A. sleep in his car, and he drove them to a park.  She awoke around 4:00 a.m. to the feeling of Badio touching her back.  M.A. angrily demanded he drive her to the coffee shop.  Angered by M.A.'s reaction, Badio called her a profane name.  He drove her to the train station.

A few weeks later, Badio saw M.A. on the train and invited her to come home with him; she declined the offer.

On the night of March 12, 2017, M.A. had a lot of homework.  She was headed to the coffee shop when Badio approached her and suggested that she come to his house, "no strings attached."  The offer appealed to M.A., because, she explained, "I needed to do my homework.  I needed a place to sleep.  I was hungry, and . . . I didn't have the expectation he was violent.  Maybe rude, but not violent."  They collected her belongings, purchased food, and walked to Badio's home.  There, M.A. did her homework on Badio's bed while he cooked.

Later that night, after they ate, M.A. dozed off while doing her homework.  She awoke to find her clothing unfastened and Badio over her, trying to push her legs open.  M.A. testified that he was "easing into my, you know, pelvis area.  My legs were open, and he didn't have . . . really any clothes on.  Him trying to, like, push his self on me."  Badio tried to put his erect penis into her vagina.  M.A. testified, "[H]e pushed my legs open and I could not close them."  Her movement was restricted when Badio held her legs open.

M.A. testified that she recalled telling the police on the night of the incident that Badio had digitally penetrated her, but by the time of trial she could not "see it in [her] mind." She had a clear visual memory of Badio pushing her legs open and trying to enter her vagina, and she remembered that Badio "tried to touch [her] vagina with his hand." M.A. could not remember if Badio put his hand on her vagina before or after he attempted to insert his penis, and she struggled to remember exactly what he did with his hand: "I—I somewhat remember him trying to—grazing at my—his hand against my thigh and my vagina and—but I don't completely remember. I have to be honest. Maybe because I'm nervous, but I really don't—."

M.A. demanded that Badio stop, and he complied after approximately two minutes. Badio told M.A. in an aggressive tone to stop playing; he dressed and left the room. M.A. resumed her homework.

Later, Badio and his roommate came into the bedroom to go to sleep. M.A. kept her clothes on and positioned her body so that her head was near Badio's feet to discourage him from any further sexual advances. Badio became angry and instructed her to lie in the other direction. M.A. felt uncomfortable but did not leave because she did not want to be outside in the middle of the night. She told Badio repeatedly that she did not want to have sex with him. Each time, he responded that she should stop playing.

M.A. fell asleep. When she awoke, her dress was pulled up and Badio's penis was inside her vagina. M.A. pulled away, dislodging his penis. Badio became aggressive, called her a "bitch," told her a number of times to "stop playing," and pulled her hair. He balled up his fist and moved toward her as though

he was going to hit her.  Badio's roommate intervened and told Badio not to force M.A. to have sex.

Badio tossed his two cell phones on his bed, then carried M.A.'s suitcase outside and left it at the side of the road.  M.A. took Badio's phones so she could call the police and to prevent Badio from calling someone to help him or hurt her.  She left the home and retrieved her suitcase.

After he noticed his phones were missing, Badio chased M.A. down the street.  She tossed the phone she believed to be more functional over a fence and returned the other phone to him.  M.A. asked people on the street to call the police.  Badio told them not to call the police and accused her of taking his phone.

M.A. reported the incident to the police and underwent a sexual assault examination.  The sexual assault nurse who examined M.A., Sandra Wilkinson, testified at trial that during the examination, M.A. said she had met a man on the street who offered her a meal and a place to do homework.  M.A. reported to Wilkinson that the man touched her vagina, penetrated her vagina with his hand, and placed his penis inside her vagina.  M.A. had no physical injuries and reported no pain.  On cross-examination, Wilkinson testified she had made a notation in her report that M.A. said the second time she was digitally penetrated, she said, "No, stop," and then "Okay.  Whatever." Wilkinson did not interpret this remark as consent but as wanting "it over with."

Spouses Evelin and Ernesto Palomar testified at trial. In the early morning on March 13, 2017, Evelin[2] was sitting in her minivan, waiting for her husband, when she saw Badio chase a screaming M.A. down the street and put his hands on her shoulders. Evelin called 911 when M.A. approached and said she needed help. M.A. backed away from the car and onto the sidewalk, looking frightened, when Badio approached. Evelin could see Badio was agitated; as he came closer, he was peering into the windows of parked cars and trying to open the doors. Evelin became concerned for her own safety, afraid Badio might try to open her minivan's door.

Ernesto testified he returned to the minivan from parking another of his vehicles while M.A. was asking Evelin to call the police. M.A. was wearing a coat and shoes; Badio was clad in shorts and wearing no shoes or socks. It seemed to Ernesto that Badio and M.A. had been in a confrontation. Badio was enraged and Ernesto did not feel safe.

M.A. told Ernesto Badio had "molested" her. Badio accused her of stealing his phone and insisted that Ernesto not call the police; Ernesto called the police anyway. Badio left. He returned wearing pants and shoes.

Los Angeles Police Department (LAPD) officer Neil Reyes testified he and his partner were the first officers to arrive at the scene. Reyes spoke with Badio's roommate, Jason Wrighten. Wrighten told Reyes that earlier that night, while he was sitting outside the bedroom he shared with Badio, he heard M.A. repeatedly saying "no" for an hour and a half. When Wrighten

---

[2] As the Palomars share a surname, we refer to them by their first names for clarity.

9

later entered the bedroom, he saw Badio rubbing M.A.'s vaginal area with his hand and heard M.A. say to Badio, "Stop. I'm not fucking you."

According to Reyes, Wrighten reported Badio accused M.A. of being a "tease" and told her, "I'm going to take that pussy, bitch." Badio turned off the bedroom lights, and Wrighten heard M.A. again tell Badio to stop. "I was already inside you," Badio said to M.A. M.A. replied, "Yeah, but I don't want you inside me, so stop."

Sergeant Maricela Vargas testified she interviewed Wrighten a few days after the incident. Wrighten told her he and Badio had only been roommates for about a week when he brought M.A. home. Badio asked Wrighten to leave him alone with M.A. While Wrighten waited outside the bedroom, he sent text messages to a friend in which he described the sounds he heard coming from inside. At 10:59 p.m., Wrighten texted, "She's saying nothing but 'stop.'" In a 11:13 p.m., text, he wrote that he could hear Badio and M.A. arguing. At 11:18 p.m., Wrighten sent a message saying, "Bitch is damn near yelling 'Stop. Don't touch me.'" After midnight, at 12:25 a.m., Wrighten sent a text message that Badio was "getting crazy back there. He continues to touch on the girl."

Wrighten told Vargas that M.A. was not the first woman Badio had brought home during the short time they had roomed together. Earlier in the week, a woman who looked young, homeless, and hungry came to the house. Wrighten heard the woman say to Badio, "You promised me food," and Badio said, "It'll come in time." It appeared to Wrighten that the woman realized she was not going to be fed until she had sex with Badio. The two had sex and then Badio gave her food.

10

Wrighten testified at trial unwillingly. He denied being concerned about his safety but admitted "people on the street" had discussed the case and the charges with him. Wrighten no longer recalled much of what he had told Vargas. He testified on the night of the incident he heard "a man trying to do his thing, which is—it wasn't anything out of character," and a woman saying "no" a number of times. Wrighten said the woman was not screaming and did not sound terrified. He said he had been "clowning" when he sent the text messages describing what he had heard, and he exaggerated when he spoke with the police. Wrighten testified M.A. had told him Badio put his penis inside her and she had not wanted him to, but Wrighten thought M.A. was just angry Badio placed her suitcase outside. Wrighten had used crystal methamphetamine in the days before the incident.

II.     **Defense Evidence**

Badio testified in his own defense. He acknowledged he knew D.O., M.A., and the unnamed woman mentioned by Wrighten; all three had come to his room in a sober living house. Badio testified he was not a violent person, and although he did get angry from time to time, he did not strike out physically. He respected and appreciated women.

According to Badio, D.O. approached him at the bus stop; when he said he was a personal trainer, she asked him to train her. Training D.O. was "a favor." Their relationship, he testified, "really wasn't a professional relationship because she wasn't really paying me." D.O. sent him a photograph of herself. Badio thought this was flirtatious, and told D.O. so; but "[a]t another point, I realized that because she had . . . said she wanted . . . a tune up [through personal training], I realized she was sending

11

me a picture to show me how she looked, so I could see how she looked."

After D.O. twice failed to meet him for scheduled sessions, Badio told her he would not be able to train her. Several days later, D.O. telephoned him late at night. She was frantic, screamed that she was having problems with her mother, and begged Badio to pick her up. He took a taxi to the place D.O. wanted him to meet her, but she never appeared.

Two days later an agitated and screaming D.O. called Badio and again asked him to pick her up. He initially refused but relented when she begged. When Badio met up with D.O., she suggested they go to Badio's house. Despite the rules against female overnight guests, Badio took D.O. home because she had no friends to help her. It was a five- or 10-minute drive, and he did not stop anywhere on the way. They had a flirtatious conversation in the car; both were laughing. The windows of the car were rolled down, and the doors were not locked.

D.O. accompanied Badio inside voluntarily and exhibited no fear or apprehension. D.O. wanted water but would not drink tap water, so he decided to go the store to buy mineral water for her. D.O. told Badio to purchase condoms as well.

When Badio returned, he found D.O. had taken a shower and was sitting on his bed wearing only her underpants. To Badio, "[s]he looked like she was ready to have sex." They kissed and "romantically touched each other['s] private parts." D.O. told him she was going to remove her underwear and he should put on a condom.

Badio testified their sexual encounter lasted 45 minutes to an hour; his penis was inside her vagina for approximately 30 minutes. At first, they were side by side; he later moved on

top of her.  He never pinned her down, held her down, or restrained her movement.  He did not have sex with her against her will.  Badio denied attempting to have anal sex with D.O., digitally penetrating her, or placing his penis in her mouth.  According to Badio, D.O. enjoyed their sexual activity; she never said no, resisted, or acted upset.

D.O. spent the night with Badio and left with him in the morning.  He dropped her off at the train station and never saw her again.

M.A. also approached Badio at the train station and flirted with him.  She accepted his offer of a ride, and they stopped for coffee.  He asked if she was homeless and she said she was between homes.  He refused M.A.'s request to go to his house to do her homework but told her she could do her homework in his car.  Badio drove them to a park, and M.A. did her homework while he dozed in his seat.  They never touched each other or spoke in a romantic manner.

The next time Badio saw M.A., she greeted him at the bus stop and asked for money for coffee.  Badio gave her money and offered that she could do her homework at his house in exchange for a massage and sex.  M.A. agreed.

Badio paid Wrighten to leave so he and M.A. could have privacy.  Wrighten left the house for an hour or two, perhaps less.

M.A. did her homework in Badio's bedroom while Badio cooked.  They ate together in the bedroom, and when they finished, he asked, "So, what's up with the deal?"  M.A. wanted Badio to massage her.  At first, Badio massaged her back, buttocks, and legs; then she stopped him, rolled over, and directed him to massage her leg.  Badio began massaging her leg, and she told him several times to move his hands higher.

13

Eventually at her request he was massaging her near her groin. M.A. placed Badio's left hand on her vagina, and he massaged, caressed, and digitally penetrated her. M.A. did not say no. At no time did he place his finger in M.A.'s vagina without her consent.

Badio had an erection and was about to remove his shorts when M.A. told him not to because she did not want to have sex. Badio reminded her of their agreement, but she refused to have sex with him. Badio was irritated but stopped. According to Badio, "When I stopped, I put my pants on and I put my shorts on and I kept asking her, 'Why [are] you not complying with the deal?'" M.A. did not respond, and he became "really upset" because they "had a deal and she wasn't living up to the deal." Badio repeatedly asked her to leave, but she refused.

After about 45 minutes of telling M.A. to leave, Badio told Wrighten he could enter the bedroom and go to sleep because "the deal wasn't going to go down." Badio said he had asked M.A. to leave, but Wrighten thought he should keep her there so both he and Badio could have sex with her.

M.A. only left the house when Badio took her suitcase outside to the street. Badio soon noticed his phone was missing, and he ran after M.A. to get it back. They argued for 15 to 20 minutes, during which time M.A. gave him the older of his two phones and denied having the other.

At some point, Badio noticed Ernesto watching them and tried to explain to Ernesto what was happening. Ernesto said he was going to call the police, but Badio told him not to call the police until he recovered his phone. Badio did not want the police summoned because he did not want to call attention to himself. Ernesto called the police.

14

Badio was cold, so while waiting for the police he went back to his house and put on sweat pants and shoes. He waved down the police when they arrived so that he could tell them his phone had been taken. He tried to explain the situation to the police, but he was arrested.

Cari Caruso, a certified sexual assault examiner who had reviewed the reports of the examinations of M.A. and D.O., testified as an expert witness that Wilkinson, the examiner who examined M.A., was incorrect when she testified that the light used during an examination would only fluoresce when shining upon bodily fluids; in fact it detects a wide variety of substances. Caruso also testified that quotations in a report, such as the "Okay, whatever," in Wilkinson's report, reflect statements of the patient and typically relate to the history related by the patient. With respect to D.O.'s sexual assault exam, Caruso testified redness and bruising, such as that found around D.O.'s hymen, can result from sexual acts or non-sexual causes. The report did not note any bruises on D.O.'s wrists or thighs, or any physical signs that she had been restrained by force. Findings consistent with a patient's history, Caruso stated, may also be consistent with something other than the given history.

Badio's younger brother testified Badio was a peaceful, nonviolent person who had no problems in his relationships with women.

## III. Conviction and Sentencing

The jury convicted Badio as charged with respect to M.A., finding him guilty of sexual penetration with a foreign object (count 1), rape of an unconscious person (count 2), and assault with the intent to commit a felony (count 3). As to D.O., the jury convicted Badio of sexual penetration by a foreign object (count

5), sexual battery with restraint (count 6), false imprisonment by violence (count 7), rape (count 8), and dissuading a witness from reporting a crime (count 10). The jury found Badio not guilty on count 9, attempted sodomy of D.O. by use of force. Additionally, the jury found true the special allegation that counts 1, 5, and 8 were committed against more than one victim.

At sentencing, the court imposed a determinate sentence of four years eight months: four years for count 3 and a consecutive eight-month term on count 10. The court imposed a concurrent sentence of three years on count 6, and it imposed but stayed a two-year sentence on count 7 under section 654. Under the One Strike law, the court imposed indeterminate sentences of 15 years to life on counts 1, 2, 5, and 8. The court designated the two rape sentences (counts 2 and 8) as consecutive and ordered the two sentences for sexual penetration by a foreign object (counts 1 and 5) to run concurrently. Badio's total sentence was 30 years to life plus four years eight months in state prison.

Badio appeals.

## DISCUSSION

### I. Count 1: Sexual Penetration by a Foreign Object (M.A.)

Under section 289, subdivision (a)(1)(A), it is a crime to commit "an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." The force required for sexual penetration in violation of section 289, subdivision (a)(1)(A), is " 'sufficient force to overcome [the victim's] will.' " (*People v. McCann* (2019) 41 Cal.App.5th 149, 156; see also CALCRIM No. 1045.) It "includes circumstances where the victim did not

16

want to engage in the act and did not positively cooperate with it," (*People v. Aguilar* (2019) 41 Cal.App.5th 1023, 1026 (*Aguilar*)), as well as "the force used to accomplish 'the penetration and the physical movement and positioning of [the victim's] body in accomplishing the act.' " (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071 (*Thomas*).)

Badio contends the evidence is insufficient to support his conviction in count 1 for sexual penetration by a foreign object of M.A. because there was no evidence that the penetration was accomplished by force, violence, duress, menace, or fear of immediate and unlawful bodily injury. " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'This standard applies whether direct or circumstantial evidence is involved.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

The evidence of digital penetration by force was sufficient to support the conviction. It was undisputed Badio's hand had penetrated M.A.'s vagina—he testified his fingers were inside her vagina during their time alone in the bedroom, although he asserted this was consensual and initiated by M.A. While M.A.

17

could not clearly remember the digital penetration by the time of trial, she vividly recalled Badio's use of force during the incident. She awakened to find Badio over her. He unfastened her clothing. He pushed her legs open, and she was unable to close them. Badio's physical movement and positioning of M.A.'s body, as well as the restriction on her movement when he pushed and held her legs open, constituted the requisite force for a violation of section 289, subdivision (a)(1)(A). (*Thomas*, *supra*, 15 Cal.App.5th at p. 1071.) Moreover, there was evidence that M.A. did not want to engage in this act: M.A. reported to the sexual assault examiner that she told Badio to stop when he put his finger inside her, and Wrighten, listening from outside the room, heard her say "no" over and over. Based on this evidence, a reasonable jury could conclude the digital penetration was committed under "circumstances where the victim did not want to engage in the act and did not positively cooperate with it." (*Aguilar*, *supra*, 41 Cal.App.5th at p. 1026.)

Nevertheless, Badio contends that because M.A. never in her testimony specifically "related the action of pushing her legs open so that she could not close them to the digital penetration," there may have been evidence he used force when attempting to insert his penis into M.A.'s vagina but there was no evidence he used force in conjunction with penetrating her with his hand. This argument depends on an artificial division of contemporaneous events. M.A. testified to a course of conduct in which Badio opened her legs to gain access to her vaginal area, restricted her movement by holding her legs apart, and subjected her to unwanted sexual contact. From the evidence presented at trial, a reasonable jury could conclude this forcible sexual contact included both an attempted penile penetration and a completed

18

digital penetration.  The evidence of force was sufficient to support the conviction on count 1.

## II.    Counts 1 and 5:  Failure to Instruct Sua Sponte on Sexual Battery Offenses as Lesser Included Offenses

Generally, the trial court must instruct the jury on any lesser included offenses supported by the evidence.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  Badio contends the trial court erred when it failed to instruct the jury sua sponte on sexual battery by restraint (§ 243.4, subd. (a)) and misdemeanor sexual battery (§ 243.4, subd. (e)(1)) as lesser included offenses of sexual penetration by a foreign object as charged in counts 1 and 5.  We independently review whether the court erred by failing to instruct on a lesser included offense.  (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

Courts apply two tests in determining whether an uncharged offense is necessarily included within a charged offense:  the "elements" test and the "accusatory pleading" test.  "Under the elements test, a court determines whether, as a matter of law, the statutory definition of the greater offense necessarily includes the lesser offense."  (*People v. Parson* (2008) 44 Cal.4th 332, 349.)  This test is satisfied if " 'all legal elements of the lesser offense are also elements of the greater.' "  (*People v. Robinson* (2016) 63 Cal.4th 200, 207.)  "Under the accusatory pleading test, a court reviews the accusatory pleading to determine whether the facts actually alleged include all of the elements of the uncharged lesser offense; if it does, then the latter is necessarily included in the former."  (*Parson*, at p. 349.)  However, when "the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory

19

elements to determine if there is a lesser included offense." (*Robinson*, at p. 207.)

Here, as in *Robinson*, because Badio was charged with sexual penetration by a foreign object in language that corresponded to the statutory definition for the offense rather than referring to particular facts, we apply the statutory elements test. Sexual penetration by a foreign object occurs when a person causes "the penetration, however slight, of the genital or anal opening of any person or caus[es] another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object," when "the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§ 289, subds. (a)(1)(A), (k)(1).) A "foreign object" is "any part of the body, except a sexual organ," and an "unknown object" is "any foreign object, substance, instrument, or device, or any part of the body, including a penis, when it is not known whether penetration was by a penis or by a foreign object, substance, instrument, or device, or by any other part of the body." (§ 289, subds. (k)(2) & (k)(3).)

Sexual battery by restraint is the touching of "an intimate part of another person while that person is unlawfully restrained," against the person's will or for purposes of sexual arousal, gratification, or sexual abuse. (§ 243.4, subd. (a).) "Touching" means "physical contact with the skin of another person whether accomplished directly or through the clothing of the person committing the offense." (§ 243.4, subd. (f).)

Misdemeanor sexual battery, as defined by section 243.4, subdivision (e)(1), is the crime of touching "an intimate part of

20

another person, if the touching is against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse." For the purposes of this offense, "touching" is "physical contact with another person, whether accomplished directly, through the clothing of the person committing the offense, or through the clothing of the victim." (§ 243.4, subd. (e)(2).)

Under the statutory elements test, sexual battery is not a lesser included offense of sexual penetration by a foreign object. (*People v. Ortega* (2015) 240 Cal.App.4th 956, 967 (*Ortega*).) "The sexual battery statute does not encompass touching by a foreign object other than the offender's body. In contrast, sexual penetration by force is not limited to physical contact and can be broader: Penetration may be caused 'by any foreign object, substance, instrument, or device, or by any unknown object.' (§ 289, subd. (k)(1).) Because the forcible sexual penetration statute encompasses different types of contact than the sexual battery statute, it is possible to commit the greater without committing the lesser (e.g., where penetration is accomplished by means other than a part of the perpetrator's body[]))." (*Ortega*, at p. 967.)

Badio argues that we should instead apply the "expanded accusatory pleading test" set forth in *Ortega* and determine that in this particular case sexual battery is a lesser included offense of sexual penetration with a foreign object. In *Ortega*, the court held that "[t]he evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense." (*Ortega*, *supra*, 240 Cal.App.4th at p. 967.) Because the evidence

21

at the preliminary hearing was that Badio's hand was the only foreign object to penetrate D.O. and M.A., Badio contends that in this particular case, it was not possible to commit sexual penetration with a foreign object without also committing sexual battery.

The expanded accusatory pleading test in *Ortega* is inconsistent with the California Supreme Court's decision in *People v. Montoya* (2004) 33 Cal.4th 1031 (*Montoya*), which requires courts to "consider *only* the [accusatory] pleading" in determining whether a charged offense includes a lesser included offense under the accusatory pleading test. (*Id.* at p. 1036.) In *Montoya*, the Supreme Court disapproved *People v. Rush* (1993) 16 Cal.App.4th 20, which considered evidence at the preliminary hearing in applying the accusatory pleading test. (*Montoya*, at p. 1036, fn. 4.) Courts since *Montoya* have declined to follow *Ortega* and have continued to apply the rule excluding evidence at the preliminary hearing in applying the accusatory pleading test. (See, e.g., *People v. Alvarez* (2019) 32 Cal.App.5th 781, 787–790 (*Alvarez*); *People v. Munoz* (2019) 31 Cal.App.5th 143, 156–158 (*Munoz*); *People v. Macias* (2018) 26 Cal.App.5th 957, 963–965.) As the court in *Munoz* explained: "The Supreme Court has indicated repeatedly . . . that when applying the accusatory pleading test to determine whether one offense is necessarily included in another, courts do not look to evidence beyond the actual pleading and its allegations regarding the purported greater offense." (*Munoz*, at p. 156; see also *People v. Smith* (2013) 57 Cal.4th 232, 244 ["[t]he trial court need only examine the accusatory pleading"].)

Badio contends *Montoya* is not dispositive here because *Montoya* involved multiple convictions rather than lesser

22

included offenses, but the *Montoya* "court articulated the general standard for the accusatory pleading test before considering its application in a multiple conviction case," indicating that it " 'intended its rule not only to apply in the context of multiple convictions, but also in the context of determining whether instructions on a lesser offense were warranted.' (*Munoz, supra*, 31 CalApp.5th at p. 158.)" (*Alvarez, supra*, 32 Cal.App.5th at pp. 788–789.) Badio also distinguishes *Montoya* on the ground that the Supreme Court later held in *People v. Sloan* (2007) 42 Cal.4th 110 that courts should use the statutory elements test rather than the accusatory pleadings test to determine whether a defendant suffered impermissible multiple convictions, but Badio does not describe, nor can we identify, any respect in which the ruling in *Sloan* undermines the Supreme Court's articulation of the accusatory pleading test in *Montoya* or its prohibition on consulting evidence from the preliminary hearing when applying that test.

We therefore follow the Supreme Court's decision in *Montoya* and decline to apply the expanded accusatory pleading test here. The trial court did not have a sua sponte duty to instruct on sexual battery as a lesser included offense of sexual penetration by a foreign object.

## III.   CALCRIM No. 1191B

CALCRIM No. 1191B provides, "The People presented evidence that the defendant committed multiple sex offenses in counts 1 though 6, 8, and 9.  [¶]  If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude

that the defendant was likely to commit and did commit the other sex offenses.  [¶]  If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of another crime.  The People must still prove each crime beyond a reasonable doubt."

Badio argues CALCRIM No. 1191B improperly permitted D.O. and M.A. to corroborate their own accusations in violation of state law and principles of due process.  Although he did not object to the instruction at trial, we address his argument because he alleges the instruction lowered the prosecution's burden of proof and violated his due process rights.  (§ 1259 [appellate court may review jury instructions even if no objection was made in the trial court if the substantial rights of the defendant were affected].)

Generally, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  (Evid. Code, § 1101, subd. (a).)  However, Evidence Code section 1108 modifies this rule in criminal cases involving a sexual offense.  In such cases, "evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101," provided that the evidence is admissible under Evidence Code section 352.  (Evid. Code, § 1108, subd. (a)).  Evidence Code section 1108, enacted in 1995, "was intended in sex offense cases to relax the evidentiary restraints [Evidence Code] section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating

24

the victim's and the defendant's credibility." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)

Evidence Code section 1108 is not limited to testimony provided by third parties (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 502 (*Gonzales*)), nor is it restricted to uncharged offenses.[3] (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1164 (*Villatoro*).)  The California Supreme Court has explained, "[T]he clear purpose of [Evidence Code] section 1108 is to permit the jury's consideration of evidence of a defendant's propensity to commit sexual offenses.  'The propensity to commit sexual offenses is not a common attribute among the general public.  Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony.'  [Citations.]  '[C]ase law clearly shows that evidence that [a defendant] committed other sex offenses is at least circumstantially *relevant* to the issue of his disposition or propensity to commit these offenses.'  [Citations.]  In light of this clear purpose, we perceive no reason why the Legislature would exclude charged sexual offenses from [Evidence Code] section 1108's purview, and no indication that it did so in either the text of [Evidence Code] section 1108 or its legislative history.  Whether an offense is charged or uncharged in the current prosecution does not affect in any way its relevance as propensity evidence." (*Villatoro*, at p. 1164.)

---

[3]     CALCRIM No. 1191A is given to the jury when uncharged offenses are offered as propensity evidence, and CALCRIM No. 1191B is used when charged offenses are offered for that purpose.  (*Gonzales, supra*, 16 Cal.App.5th at p. 496, fn. 1.)

25

Badio acknowledges that under Evidence Code section 1108 if the jury found one or more of the specified offenses involving M.A. to be proven beyond a reasonable doubt, it was entitled to conclude Badio was disposed to and did commit one or more of the offenses charged involving D.O. (Evid. Code, § 1108.) But Badio contends CALCRIM No. 1191B also allows "each alleged victim's accusations on one of the charges relating to her to support an inference that he 'was likely to commit and did commit' the remaining counts relating to her," in violation of California law. His argument rests on *People v. Stanley* (1967) 67 Cal.2d 812 (*Stanley*) and *People v. Scott* (1978) 21 Cal.3d 284 (*Scott*).

In *Stanley*, the California Supreme Court stated, "[W]here the basic issue of the case is the veracity of the prosecuting witness and the defendant as to the commission of the acts charged, the trier of fact is not aided by evidence of other offenses where that evidence is limited to the uncorroborated testimony of the prosecuting witness." (*Stanley*, *supra*, 67 Cal.2d at p. 817.) The Supreme Court, however, refused to adopt a rigid rule for the admission or exclusion of victim-witnesses' testimony of uncharged crimes, ruling that admission of such evidence should be determined by " 'a weighing of the probative value of the evidence offered against the harm it is likely to cause.' " (*Id.* at p. 818.) In *Scott*, the court cited *Stanley,* without discussion, to advise the trial court on remand that evidence of uncharged sexual conduct by the testimony of the victim was inadmissible. (*Scott*, *supra*, 21 Cal.3d at p. 297.)

Neither *Stanley* nor *Scott* is helpful in assessing the admission of evidence under Evidence Code section 1108, subdivision (a) because both were decided before the provision

was enacted, profoundly altering the rules concerning propensity evidence in sexual offense cases.  Moreover, *Stanley* and *Scott* concern the situation in which the sole evidence of a crime is the prosecuting witness's uncorroborated testimony.  (*Stanley*, *supra*, 67 Cal.2d at p. 819 [witness's testimony about other offenses "was not corroborated by any other evidence"]; *Scott*, *supra*, 21 Cal.3d at p. 297 ["[w]here the sole evidence of uncharged sexual conduct is the uncorroborated testimony of the prosecutrix"].)  That is not the case here.  D.O.'s testimony was corroborated by the evidence of injuries to her genital area observed during the sexual assault examination.  With respect to M.A., Badio's roommate not only heard the sexual assault, he sent contemporaneous text messages documenting M.A.'s lack of consent, her prolonged and unavailing protests against being touched, and Badio's disregard of her express instructions to stop.  Wrighten told the police he saw Badio touch M.A.'s vagina, and he heard Badio both admit he had penetrated M.A. ("I was already inside you,") and tell her he was going to do it again ("I'm going to take that pussy, bitch.")

Badio also argues CALCRIM No. 1191B violates due process because the inference it permits is irrational.  Because "proof of rape . . . does not prove forcible digital penetration," he argues, CALCRIM No. 1191B "violated due process by lowering the prosecution's burden of proof."  The inference permitted by CALCRIM No. 1191B is not irrational.  Proof of rape may not prove other sexual offenses, but a propensity to rape is nonetheless probative with respect to the other charged offenses.  "[E]vidence of a defendant's other sex offenses constitutes relevant circumstantial evidence that he committed the charged sex offenses."  (*Falsetta*, *supra*, 21 Cal.4th at p. 920.)  As the court observed in *Gonzales*, *supra*, 16 Cal.App.5th at page 502, in the

27

context of a victim's testimony concerning uncharged sexual offenses, "[T]here is nothing irrational about a victim supporting her testimony with testimony of uncharged sexual offenses." This "testimony is not as probative as similar testimony from a third party," but it "is still probative." (*Ibid*.)

Finally, contrary to Badio's assertion, CALCRIM No. 1191B does not lessen the prosecution's burden of proof: it expressly states that every offense must be proven beyond a reasonable doubt, even those used to draw an inference of propensity. In this respect, CALCRIM No. 1191B is essentially identical to the instruction approved in *Villatoro*, *supra*, 54 Cal.4th at pages 1167 through 1168. Both instructions "clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity. Thus, there was no risk the jury would apply an impermissibly low standard of proof." (*Id*. at p. 1168.) Nothing in the instruction expressed or implied to the jury that Badio's guilt on any count could be based on less than proof beyond a reasonable doubt.

## IV.  Sentencing Issues

Pursuant to the One Strike law, the trial court imposed a 15-year-to-life sentence for the rape of M.A. while she was unconscious (count 2). As the Attorney General points out, rape of an unconscious person, set forth in section 261, subdivision (a)(4), is not an offense falling within the scope of the One Strike law. (§ 667.61, subd. (c)(1) [listing rape in violation of section 261, subds. (a)(2) & (a)(6)]; *People v. Estrada* (1997) 57 Cal.App.4th 1270, 1276, fn. 6.) Because the sentence on count 2 was not authorized by law, the matter must be remanded for resentencing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for

resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

Badio contends the two indeterminate 15-years-to-life sentences constitute cruel and unusual punishment within the meaning of the state and federal constitutions. Because the matter must be remanded for resentencing, Badio's cruel and unusual punishment argument is moot, and we do not address it here. A case " ' "becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief." ' " (*In re Arroyo* (2019) 37 Cal.App.5th 727, 732.)

## DISPOSITION

The judgment of conviction is affirmed; the sentence is vacated; and the matter remanded for the limited purpose of allowing the trial court to resentence Badio in accordance with the principles expressed in this opinion.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


STRATTON, J.

We concur:


GRIMES, Acting P. J.


WILEY, J.